# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 2, 2010 Session

## STEPHEN LYNN HUGUELEY v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Hardeman County**
**No. 6665      J. Weber McCraw, Judge**

---

**No. W2009-00271-CCA-R3-PD  -  Filed June 8, 2011**

---

Following affirmance on direct appeal of his murder conviction and accompanying sentence of death, *State v. Hugueley*, 185 S.W.3d 356 (Tenn. 2006), the Petitioner, Stephen Lynn Hugueley, filed a *pro se* petition for post-conviction relief.  The post-conviction court appointed the Office of the Post-Conviction Defender to represent the Petitioner.  The Petitioner thereafter wrote the post-conviction court expressing his desire to withdraw his petition for post-conviction relief.  A competency hearing was held in November 2008.  On January 8, 2009, the post-conviction court found the Petitioner competent and entered an order dismissing the petition for post-conviction relief.  A notice of appeal was filed on February 19, 2009.  The Petitioner filed a motion to remand the matter to the post-conviction court.  The motion was predicated upon the Petitioner's desire to proceed with any and all available challenges to his conviction and sentence.  This court entered an order concluding that the motion to remand shall be heard contemporaneously with arguments on the merits of the Petitioner's Rule 3 appeal.  On appeal to this court, the Petitioner presents a number of claims related to the lower court's determination that he was competent to withdraw his petition for post-conviction relief, including the lower court's denial of independent experts, medically appropriate experts, and sufficient time to prepare.  Following a thorough and exhaustive review of the record and the applicable law, this court declines to expand the precedent established in *Pike v. State* and concludes that the Petitioner may not belatedly withdraw his decision to dismiss his petition for post-conviction relief.  Additionally, this court concludes that the post-conviction court did not err in concluding that the Petitioner was competent to withdraw his motion.  Accordingly, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, delivered the opinion of the Court, in which DAVID H. WELLES and CAMILLE R. MCMULLEN, JJ., joined.

Kelly Gleason and Sara Willingham, Nashville, Tennessee, for the appellant, Stephen Lynn Hugueley.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael Moore, Solicitor General; Angele M. Gregory, Assistant Attorney General; D. Michael Dunavant, District Attorney General; Terry Dycus and Joe Van Dyke, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Facts Underlying the Petitioner's Conviction**

On January 17, 2002, the Petitioner was an inmate at the Hardeman County Correctional Facility, housed in "F" pod. Correctional counselor Delbert Steed entered "F" pod in order to counsel inmates. Mr. Steed was sitting at a table when the Petitioner approached from behind and began stabbing Mr. Steed with a homemade weapon. The Petitioner stabbed Mr. Steed a total of thirty-six times. The Petitioner did not cease stabbing the victim until the handle of the homemade weapon broke. The Petitioner then laid down on the floor and permitted correctional officers to restrain and move him. The victim was recovered with the sharpened portion of the weapon still embedded in his back and was transported to the infirmary.

After the incident, an Internal Affairs investigator interviewed the Petitioner. The Petitioner was advised of his rights and agreed to waive them. The Petitioner stated his intense dislike of the victim and informed the investigator that he had begun thinking about killing Mr. Steed the previous Monday. The Petitioner admitted that he intended to kill the victim by stabbing "the most vital organs first . . . the heart and the lung."

In May 2003, the Petitioner wrote a letter to the District Attorney. In the letter, the Petitioner averred: "I did with malicious intent premeditatedly murder Delbert Steed, and as indicated in my statement to Internal Affairs, I have no regret or remorse for this crime and I fully intended to kill others that day but was unable to do so because the handle on my weapon broke." During trial, the Petitioner described his attack on the victim as follows:

I was stabbing Counselor Steed. He was laying on the floor, stomach down. I

-2-

was trying to drive it plumb through and hit the concrete below him. That was my intentions. I heard the door pop behind me. I turned around and it was the Watkins guy that testified yesterday, and a little girl named Perry. When I seen them, I took one and a half steps toward them. At that time, I still had the weapon in my hand. And they said, "He's got a knife," and slammed the door.

And they stood outside the door while I stabbed the man while he was laying on the floor, face down, I stabbed him about eight more times trying to run it plumb through him. They didn't come in until when I drawed back going to hit him again, I didn't see nothing but a piece of pen, Magic Marker sticking out of my hand. . . .

On cross-examination, the Petitioner stated, "In the world I live in, you die for disrespect. It should apply to both employee and inmate." He explained that he made the murder weapon from a piece of metal removed from a laundry cart. He used sandpaper from a belt sander to sharpen the point. He maintained that he would not have quit stabbing the victim if the handle of the weapon had not broken off. He admitted that he aimed for the victim's vital organs.

The Petitioner acknowledged that his actions in killing the victim were both intentional and premeditated. He also acknowledged that during his conversations with defense counsel, he consistently maintained that he wanted the death penalty.

During the penalty phase of the Petitioner's trial, the State introduced by stipulation three certified judgments of conviction against the Petitioner. These judgments established that the Petitioner was convicted of first degree murder in 1986, first degree murder in 1992, and attempted first degree murder in 1998.

The State also presented the testimony of pathologist Dr. Smith, who characterized the murder weapon as one that would cause significant pain "on a living, awake individual." He described the manner in which the victim was killed as "overkill." Dr. Smith explained that the term "overkill," as used in forensic pathology, means that "there was excessive injury done to the body far in excess of what would be necessary to cause death."

The Petitioner waived his right to present any mitigating evidence. Following deliberations, the jury determined that the State had proven beyond a reasonable doubt all four of the statutory aggravating circumstances alleged, *i.e.,* the defendant was previously convicted of one (1) or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person; the murder was especially heinous,

atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; the murder was committed by the defendant while [he] was in lawful custody or in a place of lawful confinement; and the murder was committed against any law enforcement officer, corrections official, corrections employee, engaged in the performance of official duties. T.C.A. § 39-13-204(i)(2), (5), (8), (9) (Supp. 1999). The jury further determined that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. The jury sentenced the Petitioner to death for the first degree premeditated murder of Delbert Steed. *State v. Hugueley*, 185 S.W.3d 356, 356-68 (Tenn. 2006). The Tennessee Supreme Court set the Petitioner's execution date for August 15, 2006.

### Evidence Adduced Related to Current Proceedings

On July 24, 2006, the Petitioner filed a *pro se* petition for post-conviction relief in the Hardeman County Circuit Court. As grounds for relief, the Petitioner alleged, *inter alia*, that his conviction was based upon the use of a coerced confession, the use of evidence gained pursuant to an unconstitutional search, and the failure of the prosecution to disclose evidence favorable to the defendant; and that his counsel was ineffective. On July 31, 2006, the lower court, pursuant to Tennessee Code Annotated section 40-30-206(a), appointed the Office of the Post-Conviction Defender.

On October 5, 2006, the Petitioner filed, *pro se*, a petition to bar appointed counsel, Kelly Gleason, and the Office of the Post-Conviction Defender from raising any issues other than those issues raised on direct appeal. On November 3, 2006, Ms. Gleason filed a motion for an extension of time to file an amended petition for post-conviction relief and a motion to reschedule the post-conviction hearing date. Ms. Gleason maintained that if the extension of time was not granted, then she would not be able to ethically represent the Petitioner. With regard to the Petitioner's *pro se* motion indicating that "all he wants raised is the stuff that was raised on direct appeal," the post-conviction court addressed the Petitioner as follows:

> THE COURT: Good afternoon, Mr. Hugueley. . . . I need to ask you some questions, sir--
>
> PETITIONER: No.
>
> THE COURT: – to make certain that I understand what you wish to do, sir.
>
> PETITIONER: No. F*** you and your questions.

THE COURT: If you choose not to answer my questions, that's fine. I'm going to ask them sir. My job is to make sure you are treated fairly and I'm going to do the best that I can to make sure that you're treated fairly and that justice is rendered to you.

. . . .

THE COURT: . . . I'm here to try to make sure that your rights are protected and that your desires are made known, and if you choose not to cooperate, there's nothing I can do about that. . . . There's been a motion that was filed for post-conviction and then you filed a pro se petition on October 5th which indicated that you only wanted to go forward on certain issues and I'm trying to get some understanding, sir, on what you wish to do.

On the petition that you filed *pro se* in October . . . do you wish the Post-Conviction Defender's Office to represent you or do you desire to represent your own interests?

PETITIONER: I've got no answer, if that's what you're waiting on.

. . . .

PETITIONER: I waived my right to be at this hearing. Don't want to be here. Want to be back at the prison. I got better things to do with my time than be in this f***ing courthouse.

THE COURT: All right. I understand that . . . but there is some conflict of whether or not we should go forward on your petition that you're presenting.

PETITIONER: I ain't got nothing to do with it. I'm out of it.

THE COURT: Do you want the Post-Conviction lawyers to represent you or do you want to represent yourself, sir?

PETITIONER: It's up to y'all. I ain't got nothing to do with it. I'm out

of it.

The Petitioner then responded to inquiry by the State as to his desires regarding his post-conviction petition, stating:

> . . . I don't want them raising any issues without first having authorization from me to raise individual, particular issues. That was the purpose of it. I don't want them raising mental health and all that crap unless they've got to go through me to get my permission to do so first. If they are just given absolute freedom to file anything they want on my behalf, where the hell does it stop?

The lower court granted the Petitioner an additional sixty days in which to submit an amended petition for post-conviction relief. Specifically, the court noted that "[t]he Court's view is you've known about this since, at the best, July so it's not 60 days to file an amended petition. You've been aware that a petition would be needed at least since July, so just let the record clearly state the Court's thought on that as well." On November 14, 2006, the post-conviction court entered an order setting the evidentiary hearing for January 29, 2007.

On January 3, 2007, counsel for the Petitioner filed an amended petition for post-conviction relief. The amended petition primarily focused upon issues regarding the claim of ineffective assistance of counsel. On January 10, 2007, the Petitioner again appeared before the post-conviction court. The Petitioner's counsel, Kelly Gleason, stated that although an amended petition was filed, she was of the opinion that the amended petition was not prepared "in an ethical and competent manner." Ms. Gleason then submitted a second request for an extension of time, noting that the Office of the Post-Conviction Defender was short staffed and the number of pending post-conviction cases being handled by their office.

During this hearing, the post-conviction court addressed the Petitioner regarding a letter sent to the court. The court restated the contents of the Petitioner's letter:

> Now, for my main reason of writing, when I sent the petition which I was brought to court on, it was misunderstanding as to what my intent was and that it is my fault because I worded it wrong. Since appearing in court on November 4, 2006, I have been thinking about everything and with a great deal of contemplation, I have decided that I do want to withdraw my petition for post-conviction relief and I am requesting that I be brought before the Court to do it as soon as possible. I am asking you to allow me to state for the record certain things that will help the Court to understand why things have went the way they have since my trial in September, 2003.

The Petitioner stated that he did not wish his counsel to proceed with the amended petition. The Petitioner indicated that he understood that he would not be able to proceed with a new post-conviction petition if his petition for post-conviction relief was dismissed. He further indicated that he consulted with his counsel before making this statement to the court. The Petitioner addressed the court as follows:

> I pretty much said what I had to say in the letter. I want to withdraw it and I think there's – the issues of why I allowed it to continue as long as it has, they might ought to be made a part of the court record in case somebody tries to raise it later on, on a federal level or something, to say that I'm mentally unstable or that I make my decisions based on emotion or whatever. And I'd like to address the mental health issue today to get that out of the way, solve everything this one time and get it over with.

Regarding his mental health, the Petitioner stated:

> The Court . . . I'd filed a motion in 2003 and requested that my psychiatric evaluation and my IQ testing be videotaped and scaled by the Court. The Court sealed those videos and I'm willing to allow the Court to open those videos and allow [the prosecutor] and whoever else wants to see them, to view them, and I'll stand on that evaluation. I refuse any further mental health evaluation or testing.
>
> . . . .
>
> I don't like taking tests. I don't mind talking to people but I don't like taking tests and I'm not going to take another one. The Court has my testing on video for that purpose.

The Petitioner's counsel asserted that, at that time, she was unprepared to argue the issue of the Petitioner's competency and stated that the Petitioner had a long history of being diagnosed with various severe mental illnesses. The Petitioner's counsel requested that the court set a future hearing to conduct proceedings under Rule 28, Rules of the Tennessee Supreme Court.

Further discussion between the court and the Petitioner revealed that the Petitioner was not forced to seek to withdraw his post-conviction petition, was not promised anything in return for withdrawing his petition, was not on any type of psychotropic medication, and was not under the influence of anything that would alter his thinking. The Petitioner made

the following commentary:

> I'm clear. I want to comment on something that she said, though, about the signing of the July petition for the post-conviction relief. I agreed to sign that for one reason and one reason only. I received a visit every week. I get visitors – well, I was getting visitors every week and the warden at River Bend said that my visitor was not going to be allowed to visit me on death watch. So – And that was clearly contradicting what the TDOC website says about anyone who is on approved visitor list will be allowed to visit the individual on death watch. So I agreed to stall long enough to get it set up to where my visitor would be able to visit me on death watch just like anybody else's and that was the only reason. Now my visitation problem is solved. I don't have to worry about that no more. So that was the whole reason behind signing the post-conviction anyhow.

The Petitioner stated that he did not review the amended petition for post-conviction relief because he planned to withdraw the petition. He explained that "[m]y visitation issue was resolved so there was no need for me to read it." The Petitioner further indicated that he no longer desired to be represented by the Office of the Post-Conviction Defender, did not want other counsel appointed to represent him, and did not want to continue the post-conviction hearing.

In light of the Petitioner's responses to questioning, the post-conviction court denied the motion to continue the post-conviction evidentiary hearing, finding that there had been ample time for the matter to move forward. The court took the Petitioner's request to withdraw the petition for post-conviction relief and the accompanying competency issue under advisement. Counsel for the Petitioner requested permission to seek interlocutory review of the lower court's denial of a continuance, which was granted by the court.

On January 16, 2007, the lower court entered an order, making the following findings of fact and conclusions of law:

> . . . [The court] is satisfied that petitioner does not desire to proceed with his post-conviction petition, understands the significance and consequences of withdrawing his post-conviction petition[]; and is knowingly, intelligently and voluntarily seeking to withdraw his petition. . . .
>
> Petitioner indicated that he spoke with counsel about his desire to forego these proceedings and is aware that withdrawing his petition will preclude filing future petitions for post-conviction relief and will result in the court setting a new execution date. Petitioner further indicated that he was not under the

-8-

influence of any medication or substance that could possibly interfere with his ability to make a clear decision. Finally, petitioner explained to the court that he initially agreed to file a post-conviction because he was having problems receiving visitors at the prison. He told the court that, at the time of filing the petition, he was on "death watch" due to his impending execution date and that he wanted more time to "straighten out" his visitation arrangements. He contends that now his visitation has been arranged, there is no longer a need to continue with his post-conviction. Thus, this court finds that first three requirements of subsection (A) of the Rule appear to have been met. . . .

. . . [T]his court is constrained by the mandates of Rule 28. . . . [B]efore this court can grant petitioner's request, it must also find that the petitioner is competent to decide whether to withdraw the post-conviction petition. . . .

. . . Thus, on January 29, 2007, post-conviction counsel should be prepared to present any proof which they contend demonstrates there is a genuine issue with regard to petitioner's competency to withdraw his post-conviction petition.

The Petitioner proceeded with his interlocutory appeal to this court. By order entered January 25, 2007, this court stayed proceedings in the lower court pending disposition of the interlocutory appeal. On June 12, 2007, this court denied the application for interlocutory appeal and vacated the stay of proceedings in the lower court.

The Petitioner authored a letter to the post-conviction court, acknowledging the Court of Criminal Appeals' decision regarding the interlocutory appeal. The Petitioner further wrote:

I have not changed my mind, I still DO NOT wish to proceed with a post-conviction appeal therefore please keep that in mind for the next hearing you schedule in my case.

On August 6, 2007, the Petitioner sent a pleading to the post-conviction court, the prosecutor, Kelly Gleason, the Attorney General's Office, and the Tennessee Supreme Court addressing issues regarding the post-conviction petition. Specifically, the Petitioner enumerated the following facts:

- In July 2006, the Petitioner was having problems with visitation and the type of visits he would be receiving on "death watch." The Petitioner's execution date was scheduled for August 15, 2006, and he did not have the time to resolve these problems. Accordingly, the Petitioner "told

Ms. Gleason that in order to <u>STALL</u> for time to prepare and resolve the problems. . . I would sign the paper for permission to file post-conviction appeals." (emphasis in original.) The Petitioner further related to Ms. Gleason that the visitation issue was the only reason he was signing a petition for post-conviction relief and that he would withdraw his petition for post-conviction relief when the visitation was resolved.

• In November 2006, the Petitioner still had not resolved his visitation issues. At this time, the Petitioner did not wish to withdraw his petition, but this was only due to the unresolved visitation issues. The Petitioner, however, took issue with the direction his appointed counsel was taking in the matter.

• Several weeks after the November 2006 hearing, the Petitioner's visitation issues were resolved. The Petitioner notified the court that he wished to withdraw his request to seek post-conviction relief.

• On January 10, 2007, the Petitioner stated in open court that he did not wish to pursue post-conviction relief and that the visitation issues, the sole reason for his initial filing, were resolved.

• The Petitioner disputed Kelly Gleason's assertion to the appellate courts that the Petitioner was "constantly changing [his] mind based on [his] mood." The Petitioner asserts that Ms. Gleason was aware of the Petitioner's intent upon his signing of the original petition.

• The Petitioner asserted that, since he did not sign the actual petition for post-conviction relief, the court should never had accepted the petition. Moreover, since the Petitioner did not sign the petition, there is no issue regarding the withdrawal of the petition.

• The Petitioner should not have to go through any type of mental health evaluation since he never signed the petition for post-conviction relief. The Petitioner maintained that he would rely upon the 2003 mental health evaluation. The Petitioner asserted that he would not take any more tests, stating "the idea that a man has to take and pass a test to be executed is insane because all one has to do is fail the test in order to avoid execution."

• The Petitioner disputed Ms. Gleason's assertions that he received head

injuries from a motorcycle accident.

On August 29, 2007, the post-conviction court conducted proceedings relative to the determination of the Petitioner's competency to withdraw his post-conviction petition. The post-conviction court addressed the Petitioner concerning correspondence received by the court and the prosecutor. Specifically, the post-conviction court delineated the following documents authored by the Petitioner:

- October 5, 2006: a motion to ban the Office of the Post-Conviction Defender from raising issues other than those raised on direct appeal.

- December 5, 2006: a letter to the court clarifying the Petitioner's position regarding the case.

- June 22, 2007: a letter to the court acknowledging that the Court of Criminal Appeals had lifted the stay and that the Petitioner did not wish to proceed with his post-conviction petition.

- July 29, 2007: a letter to the prosecutor acknowledging that the Court of Criminal Appeals had lifted the stay and that the Petitioner did not wish to proceed with his post-conviction petition.

The post-conviction court acknowledged that the Petitioner had indicated in a series of letters that he wished to withdraw his petition for post-conviction relief. In response to questioning regarding his satisfaction with his representation by the Office of the Post-Conviction Defender, the Petitioner stated:

I don't have a problem with Ms. Gleason. She's a fine lawyer. I informed her back in July of last year that there were some issues concerning my visitation on death watch and I agreed to sign the petition for post-conviction relief long – to just stop everything that was going on, give me time to solve the problems that were up about the visitation on death watch. And I told her specifically, when those problems are resolved and I know they're resolved, I will withdraw my petition for post-conviction relief. That has never been a question about it. I stated that to her up front. So it shouldn't come as a surprise.

When I found out that my visitation problems were resolved in late November, I wrote the Court and told that I wanted to withdraw the petition for post-conviction relief. I told her the same thing over the telephone, and it shouldn't have been a shock.

The Petitioner further maintained that, since November 2006, he had repeatedly advised his attorneys that he wished to withdraw his petition for post-conviction relief.

Ms. Gleason informed the court that the Petitioner had not been steadfastly interested in dismissing his petition, rather his intent fluctuated depending upon his moods or his wants. She also related an episode during which the Petitioner smeared feces in his cell. The Petitioner responded to Ms. Gleason's characterization, stating:

> Number one, the visitation issue she's talking about, it was with a longtime fiancee, on again, off again. The question surrounding the visitation was, she was visiting me every week at Brushy Mountain. I was told that she would not be able to visit me while I was on death watch. In order for her to visit on death watch, I told her – the woman in question – that I will stall long enough to resolve the issue and get approval for you to visit while on death watch 'cause it was important to her and I was willing to do that. I done it.

> In November we did split up. . . . We're still friends and she'll do anything in the world for me. So it's nothing to do with I'm heartbroken or distraught. . . . We split up 15 times over ten years. So the whole issue was, was the visitation. Well, obviously, since we split up, there's no issue of visitation on death watch. So the problem was resolved by her. . . .

> And the issue in March . . . what she fails to realize and what she doesn't know because I didn't tell her, there were several other inmates involved in that issue and it was a form of protest against certain actions at Brushy Mountain. . . . There's been no other issues like that and it was adopted from an Irish incident that occurred in one of the IRA prisons and we just took something from them and duplicated it at Brushy Mountain as a form of protest.

> I've not changed. I can produce a witness right now that will tell you that what I told you a moment ago that when I signed the post-conviction papers in July, my intent was to stall long enough to resolve the visitation problem and the witness will tell you that's been my stated goal from July until now. It's not changed. She visits with me very regular, so she's had the opportunity to talk to me face-to-face and see that I'm rational and I have conversations where I do not rattle, intelligent conversations about the Bible and history and music and many other subjects.

On December 3, 2007, the lower court entered an order regarding correspondence from the Petitioner expressing his desire to withdraw his petition for post-conviction relief

and to terminate further review of his post-conviction claims. The order recounted the procedural history in this matter. The order further related the Petitioner's correspondence with the court, including: (1) the October 5, 2006 letter in which the Petitioner requested that the court prevent appointed counsel from raising any issues other than those issues raised on direct appeal; (2) the December 5, 2006 letter in which the Petitioner complained about the method of transportation from Brushy Mountain Correctional Center to Hardeman County and further indicated that he wished to withdraw his petition for post-conviction relief; (3) the June 22, 2007 letter acknowledging the Court of Criminal Appeals' order vacating the stay of proceedings and asserting that the Petitioner did not wish to proceed with a post-conviction petition; and (4) the July 29, 2007 letter indicating that the Petitioner only signed the petition for post-conviction petition in order to resolve issues regarding visitation and that since the visitation issues were resolved, he no longer wished to pursue post-conviction relief. The lower court determined that "a genuine issue exists as to competency." The court ordered "a full competency evaluation of [the] petitioner" and ordered that both the State and the Petitioner submit to the court a list of mental health professionals to perform an evaluation of the Petitioner's competency to withdraw his petition for post-conviction relief. The court further ordered:

> . . . should petitioner wish to continue with post-conviction review, he should inform this court of his intentions in writing. Counsel shall inform petitioner that a decision to proceed with post-conviction will be final. Should petitioner decide to proceed, this court will not entertain any subsequent request to withdraw his post-conviction petition.

On January 23, 2008, the post-conviction court entered an order appointing Dr. John Hutson, a clinical psychologist, and Dr. Peter Brown, a clinical psychiatrist, to evaluate the Petitioner to determine if he is competent to waive post-conviction review. On February 6, 2008, the post-conviction court entered an order granting the Petitioner's request for an extension of time in which to perform a mental health evaluation of the Petitioner.

On June 30, 2008, the Petitioner sent the post-conviction court a letter requesting that the court remove Kelly Gleason, Alison E. Roberts, and the Office of the Post-Conviction Defender from his case. The Petitioner further requested that he be permitted to proceed *pro se*. The Petitioner stated that he has been consistent in his desire not to proceed with his post-conviction petition. The Petitioner asserted that he has been declared competent by every mental health professional who has evaluated him since 2003. The Petitioner further declared that he was found competent by a mental health professional in March 2008. Additionally, the Petitioner stated:

> . . . this court has the opportunity to dramatically shorten this process by granting my request to have the post-conviction defenders [sic] office removed

from my case and allowing me to represent myself; should this court fail to grant my request it would only add needless delays, because if the post-conviction defender's office is allowed to continue representing me they will appeal the dismissal of my petition for post-conviction relief[.]

On July 8, 2008, the Petitioner again wrote to the post-conviction court. The Petitioner reiterated his position to not proceed with his post-conviction petition and other allegations as stated in the June 30, 2008, letter. Contemporaneously, the Petitioner filed a motion relating this request. In the motion, the Petitioner stated that:

The petitioner believes that the appointed counsel does NOT have his best interest in mind or at heart, they are anti-capital punishment and their ONLY interest is preventing any individual from being executed no matter the crime; Their interest in the individual and his/her life stops once the individual no longer faces the possibility of being executed. . . . Truthfully, I do not care about what is in the best interest of everyone else, at this time I only care about what is in my best interest and I believe that only I, not some attorney with an agenda or a god complex, can do what is in my best interest which is why this court should grant this motion.

On July 24, 2008, the post-conviction court entered an order concluding that Dr. Brown was unable to expeditiously perform an evaluation of the Petitioner. The court ordered strict time limits for completing the evaluations. On August 1, 2008, the post-conviction court appointed Dr. Bruce Seidner to evaluate the Petitioner's competency.

During a competency hearing November 14, 2008, Dr. Seidner, a licensed clinical psychologist, testified that he was appointed by the court in August 2008, to evaluate the Petitioner's competency to withdraw his petition for post-conviction relief. Dr. Seidner reported that he met with the Petitioner on August 27 and 28, 2008. He utilized the PAI, which is a self-report inventory, and administered a test of malingering called the VIP. Dr. Seidner also administered the Wisconsin Card Sort Test and the Wechsler Adult Intelligent Scale, 3rd Edition. As a result of this testing, Dr. Seidner opined that the Petitioner "presents as really quite capable." Dr. Seidner determined that the Petitioner was not struggling with depression and talked about the Petitioner's self-responsibility and self-interests. Dr. Seidner concluded that there was no impairment of the Petitioner's capacity.

The Petitioner's counsel elicited responses from Dr. Seidner delineating the differences between a psychologist and a neuropsychologist. Dr. Seidner acknowledged that Dr. Pamela Auble was a neuropsychologist and had administered different tests during her evaluation of the Petitioner in 2003. Dr. Auble did not conclude that the Petitioner was not competent. Dr. Seidner noted, however, that while he was not a neuropsychologist, there was

-14-

no trauma or brain disease evident from Dr. Auble's evaluation in 2003, which would necessitate the need for evaluation by a neuropsychologist in 2008.

Dr. Seidner related that, upon contacting Brushy Mountain on August 25, 2008, he was advised by the unit manager that the Petitioner refused to take any tests and requested no-contact visitation. Dr. Seidner explained that while he did meet with the Petitioner, they were separated by a glass partition. Dr. Seidner related that the Petitioner was operating at a fourth grade level. He also related that the Petitioner's score indicated a high risk for suicide. However, Dr. Seidner rejected any conclusion that the Petitioner was "extremely depressed and suicidal." While he conceded that he had noted that the Petitioner wanted to commit "suicide by State," Dr. Seidner also acknowledged that the Petitioner had stated that "he's not suicidal." Dr. Seidner explained the apparently-conflicting statements:

> [The Petitioner] does not want to live on death row. Suicide is an unfortunate and . . . rather permanent solution to a temporary problem. There are people who have a permanent problem and there's no solution. . . . He's been sentenced to death . . . and he has weighed his self interests in terms of challenging this and what he would get, which is continued decline and a life on death row[,] which he has rejected. . . .

Dr. Seidner further noted that Dr. Keith Caruso made the distinction clear in his 2003 report when he discussed that the Petitioner was unhappy about his situation. Dr. Seidner acknowledged the Petitioner's history of contradictions and history with the criminal justice system. Dr. Seidner related that the Petitioner went to trial in 2003, rather than pleading guilty. The Petitioner then attempted to abandon his appeals. In 2005 and 2006, the Petitioner made statements that he was not filing a petition for post-conviction relief. In 2006, he made statements to the media that he was looking forward to his execution. He then filed a petition for post-conviction relief, which he later asked the judge to dismiss. Dr. Seidner described the Petitioner as dismissive of psychiatrists and psychologists. He stated that the Petitioner described himself as manipulative. Dr. Seidner conceded that the Petitioner's father committed suicide and that the Petitioner had a very dysfunctional childhood. Additionally, he acknowledged a history of mental illness in both his paternal and maternal family members.

Dr. Seidner reported that the Petitioner described his current living conditions as "sensory deprivation – breaks people mentally and physically . . . it's torture." Dr. Seidner had no knowledge that another inmate in the Petitioner's unit had committed suicide and that only two other death row inmates were housed at Brushy Mountain. Dr. Seidner was questioned regarding the Petitioner's destruction of two television sets and treasured personal items. Dr. Seidner noted that this behavior was "not impulsivity;" rather, the actions were "egregious and dramatic manipulation." Dr. Seidner remarked that the Petitioner "knows

-15-

exactly what he is doing."

Dr. Seidner acknowledged that on July 15, 1981, a report indicated that "Stephen Hugueley directs destructiveness to himself, head banging, cutting and low impulse control." He acknowledged that on January 15, 1983, when the Petitioner was fourteen years old, a report indicated that the Petitioner was transferred from one juvenile institution to another, noting that the Petitioner "attempts to inflict self injury and self mutilation." While a juvenile, the Petitioner was medicated with Mellaril, Haldol, Thorazine, Elavil, and Sinequan, all of which are classified as antidepressants. Dr. Seidner also acknowledged a psychiatric report from November 23, 1983, documenting at least two incidents of self-injurious behavior after which the Petitioner requested to be isolated. At this time, the Petitioner also indicated that he had huffed inhalants, had engaged in chronic substance abuse, heard voices telling him to do things, thought about suicide, and was depressed and angry. On December 9, 1983, the Petitioner was placed in medical isolation because he tried to hang himself twice with a sheet. At this time, the Petitioner reported family problems and that voices told him to kill his mother. In a report dated June 8, 1984, the Petitioner was certified as severely emotionally disturbed, a finding necessary to qualify for special education services. Four days later, following a disagreement with a girlfriend, the Petitioner was admitted to the hospital following ingestion of several pills with alcohol. On November 25, 1984, a report indicated at least six incidents of self-inflicted wounds resulting from the Petitioner's swallowing thumb tacks. Dr. Seidner acknowledged that the Petitioner was admitted to the hospital on February 26, 1986, and again on February 28, 1986, from overdoses of Sinequan. He noted, however, that the reports indicated that these overdoses were "not being anything more than a gesture and manipulative."

Dr. Seidner stated that a CAT scan of the Petitioner on July 25, 1986, revealed an osteolytic lesion on the right rear juncture of the frontal and temporal lobes. On October 31, 1986, the Petitioner was admitted to the Tennessee State Prison hospital with a history of recurrent auditory hallucinations. The Petitioner had surgery to remove the tumor. On February 23, 1987, the Petitioner complained of blackouts and weakness in his left arm and leg.

On August 16, 2007, Dr. Pamela Auble provided an affidavit in which she stated that she performed a neuropsychological evaluation of the Petitioner, as authorized by the trial court in 2003. She noted that the Petitioner had a long history of psychiatric illness, including major depression, suicide attempts, and hallucinations. Dr. Auble concluded that the Petitioner's ability to engage in abstract reasoning was variable. She noted that a medical record indicated that a right frontal tumor was removed in 1986, without damage to the Petitioner's brain. Due to symptoms in his left arm and leg and the Petitioner's self-report of frequent headaches, Dr. Auble recommended medical imaging of the brain to rule out a

recurrence of the tumor. Dr. Auble further noted that "[c]ompetency is not static, but rather a function of the individual's present state." Dr. Auble concluded that she was unable to "venture an opinion on [the Petitioner's] present competency" because she had not seen him in four years.

Dr. Seidner remarked that Dr. Auble did not state that the Petitioner lacked competence. Rather, Dr. Auble noted that she observed signs that could potentially be a problem. Dr. Seidner stated that Dr. Auble found a deficit in motor speed and finger tapping and related these deficits to the tumor which was removed.

The Petitioner's counsel introduced an affidavit establishing that Dr. Seidner's medical license expired on September 30, 2008. Dr. Seidner conceded that he had apparently failed to send a check for his licensing fee. The Petitioner's counsel then moved the court to strike both Dr. Seidner's report provided to the court on October 31, 2008, and his entire testimony. Dr. Seidner responded that he was still on faculty at the University of Tennessee and was still an expert in any number of matters for the court. He further stated that he could rectify this problem "online during a break." An affidavit submitted on December 1, 2008, by Melody Spitzas, the records custodian relating to licensure for psychologists in Tennessee, reflected that Dr. Seidner's license expired on September 30, 2008. Dr. Seidner renewed his license online on November 15, 2008. The affidavit further reflected that "there is a board policy that gave Dr. Seidner a ninety (90) day grace period after his license expired during which he could renew without penalty."

On August 20, 2007, Dr. Keith Caruso, through affidavit, stated that he evaluated the Petitioner in June 2003. Dr. Caruso recommended a CT scan due to the removal of a tumor when the Petitioner was eighteen years old. Dr. Caruso concluded that the Petitioner met the criteria for several disorders, including Intermittent Explosive Disorder. Dr. Caruso added that the Petitioner suffers from instability in his relationships, affect, impulse control, anger modulation, and sense of personal identity. The Petitioner has a history of suicidal ideation and self-injury and is prone to paranoid ideation and transient psychotic symptoms under stress. The competency of individuals such as this can wax and wane depending upon the circumstances. Dr. Caruso noted that he could not offer an opinion as to the Petitioner's present competency because he has not seen him in more than four years but stated that it would be prudent to reassess his current competency based upon prior evaluations.

On January 8, 2009, the post-conviction court entered an order dismissing the petition for post-conviction relief. The order reflected the procedural history of this matter, including the Petitioner's letters to the court expressing his desire to withdraw the petition for post-conviction relief. Specifically, the post-conviction court entered the following findings of fact and conclusions of law:

At an initial status hearing . . . this court inquired whether it was petitioner's desire to persist with his motion to withdraw his post-conviction petition. Petitioner responded that he wished to forego any further appeal of his conviction and sentence and stated that he was aware of the consequences of his actions. Petitioner indicated that he never intended to pursue post-conviction review. He stated that he had consented to the filing of his post-conviction petition in order to allow him time to resolve problems he was having with his visitation rights at the prison. He stated that those matters had been resolved; thus, he no longer wished to move forward with the pending litigation.

Again, prior to the start of the actual hearing to determine if a "genuine issue" as to competency existed, the court again inquired whether petitioner desired to withdraw his post-conviction petition and petitioner again indicated his desire to withdraw the petition. . . . Petitioner's responses were coherent and showed not only a clear understanding of the post-conviction process; but, also demonstrated a remarkable ability to manipulate and bend the system to accommodate his needs and desires. . . .

. . . .

At the "genuine issue" hearing, counsel for petitioner was permitted to present proof which she argued demonstrated there was a "genuine issue" as to petitioner's competency to withdraw his post conviction petition. . . . She informed the court that petitioner had a history of mental illness and brain damage. . . . [She] did reveal an incident in March of 2007, where petitioner was disciplined for smearing feces on the walls of his cell. . . .

. . . .

. . . The court allowed the petitioner to address counsel's assertions on the record and petitioner indicated that he could produce witnesses who would testify that he is rational and could say that he has not changed his mind on the issue of withdrawing his post-conviction petition. With regard to the incident alluded to by [petitioner's counsel] regarding petitioner being disciplined for smearing feces on the walls of his cell, petitioner explained that such action was a form of protest over what he and other inmates perceived as mistreatment by the guards. . . . He claimed his actions were a form of civil disobedience aimed at forcing changes in prison policy. . . .

. . . .

-18-

. . . [T]his court found . . . a genuine issue existed as to whether petitioner is competent to withdraw his post-conviction petition. . . . Thus, pursuant to Rule 28, this court ordered the parties to submit a list of mental health experts who could perform a timely evaluation of the petitioner's present competence.

The post-conviction court related that the court appointed Dr. Hutson, a clinical psychologist, and Dr. Brown, a psychiatrist, to evaluate the Petitioner for competency. Dr. Hutson timely submitted a report in which he indicated that he found the Petitioner was competent to waive post-conviction review. The court later learned that Dr. Hutson had mistakenly been compensated with funds from the Tennessee District Attorney General's Conference. Although the court found the State made no attempt to influence Dr. Hutson's opinion, the court ruled that Dr. Hutson's report would be disregarded. Dr. Brown failed to begin the evaluation six months after appointment and indicated that he would need an additional seven months. In light of the delay, the court appointed Dr. Seidner to evaluate the Petitioner. Dr. Seidner found the Petitioner competent to withdraw his petition for post-conviction review. Notwithstanding, "out of an abundance of caution," the post-conviction court scheduled an evidentiary hearing as to competency of the Petitioner.

Regarding the status of Dr. Seidner's license, the post-conviction court found that Dr. Seidner's license was never suspended since he paid his fee within the sixty-day grace period provided in Tennessee Code Annotated section 63-11-218.[1] The court thus found that "Dr. Seidner's failure to timely pay the renewal fee did not affect the validity or legitimacy of his testimony in any way and did not compromise his status as a properly appointed expert under [Tennessee Supreme Court Rule] 28 or the Tennessee Rules of Evidence." The post-conviction court continued to provide a summary of the Petitioner's medical and psychiatric history relating that:

At the age of ten, petitioner set his house on fire and was evaluated by mental health professionals of Northwest Tennessee Mental Health Center. While in juvenile custody, the petitioner's I.Q. was evaluated and he was found to have a full scale I.Q. of 78. Three years later, Petitioner was diagnosed as "socialized aggressive". . . . In 1983, he was given the Standford-Binet I.Q. test and was found to have an I.Q. of 77. Later that year, he was evaluated by Tom Biller, Ed.D. . . . Biller found petitioner has "deeply rooted antisocial tendencies." In 1986 the petitioner killed his mother and was diagnosed with "sociopathic personality disorder." He was later referred to Midtown Mental

_____

[1] Although the affidavit of Melody Spitzas states that Dr. Seidner had a ninety-day grace period to renew his licence, Tennessee Code Annotated section 63-11-218 provides for a sixty-day grace period. This discrepancy was not resolved by the post-conviction court.

Health Institute (MTMHI), where he was found competent to stand trial.

In August of 1986 doctors discovered a benign tumor on the right side of petitioner's skull. At the same time, petitioner was diagnosed with substance abuse and antisocial personality disorder. Notes from MTMHI indicate that the "CT abnormality had nothing to do with [petitioner's] thinking." Later in 1986, the petitioner had surgery to remove the tumor in his front/parietal bone. Notes from Meharry Hubbard Hospital indicate that follow up testing revealed a small tumor in the right posterior bone: however, petitioner refused further surgery. A later EEG showed normal functioning and "no evidence of brain damage." Additionally, a later CT scan was negative for tumor.

Tennessee Department of Correction records indicate that the Petitioner has been previously diagnosed with intermittent explosive disorder and antisocial/narcissistic personality disorder. In January of 2002, petitioner killed a prison counselor. In 2003 . . . Petitioner was evaluated by Pamela Auble, a clinical neuropsychologist. Dr. Auble found that petitioner's "estimated intelligence fell within the average range." . . . Dr. Auble indicated that she had ruled out depressive disorder and psychotic disorder. However, she found petitioner may be suffering from antisocial personality disorder and indicated she could not rule out borderline personality disorder. Finally, Dr. Auble found petitioner had no "widespread compromise in functioning." . . . Her reports indicate that, at the time, petitioner had a full scale IQ of 98. She noted that "the tumor that was removed in 1986 . . . without damage to the brain."

During this period, petitioner was also evaluated by Dr. Keith Caruso, a clinical psychologist. . . . [I]n 1995, petitioner was diagnosed with Delusional Disorder, Persecutoriy Type. . . . Dr. Caruso states that he found the petitioner's thought processes "were linear, logical and goal-directed." . . . Dr. Caruso stated that the petitioner later indicated that he was not suicidal; but, had "no intention of living 30 to 40 years in prison." Dr. Caruso found "no evidence of delusions or perceptual disturbance." . . .

Dr. Caruso concluded that the petitioner suffered from Intermittent Explosive Disorder, which he described as "a severe mental disease;" however, he found the petitioner was competent to stand trial.

Based upon this evidence, the court declined to find that the Petitioner's then-current comments or desires indicated that he suffered from a mental disease or defect in the form

of chronic severe depression. In addition, the court did not conclude that the Petitioner was suicidal or suffered from some other disorder or defect that might affect his ability to make a rational choice to withdraw from further post-conviction review of his conviction and sentence. The court continued to find that:

> Even if this court were to find petitioner does indeed suffer from a mental disease or defect either in the form of chronic, severe depression; brain abnormality or injury; or some other psychological malady, because this court finds that such mental disease or defect does not prevent petitioner from understanding his legal position, the court would nonetheless find petitioner is competent to withdraw his post conviction petition.
>
> . . . [T]his court finds petitioner has a broad grasp of the legal ramifications of his decision. [T]he petitioner has demonstrated a detailed understanding of the sentence he faces, the ramifications of withdrawing his current petition for post-conviction relief, and the legal procedures associated with such a decision.

The lower court further noted that the "petitioner appears particularly adept at manipulating the system to suit his purpose. Thus, his choices appear both cogent and rational." Finally, the lower court determined that "even if it were to presume petitioner suffers from some mental disease or defect, any such affliction has not compromised petitioner's ability to make a rational choice amongst the legal options available to him."

On February 9, 2009, the Petitioner, through counsel, filed a notice of appeal. On May 24, 2010, the Petitioner's counsel filed an appeal on his behalf raising numerous challenges to the process by which the post-conviction court found him to be competent and asserting that this finding was erroneous. On July 6, 2009, the Petitioner wrote a letter to the State threatening that the State's failure to provide him with "daily" telephone contact with his attorneys would result in his "attempt to proceed with post-conviction appeals." The Petitioner further asserted that he would throw a "monkey wrench" into the process if his request was not honored. His motion for such telephone access was later denied by this court.

On August 10, 2009, the Petitioner signed an affidavit stating that "as I have informed my attorneys, I want to resume post-conviction proceedings and pursue all legal claims from my conviction and death sentence." On August 14, 2009, the Petitioner, through counsel, filed a motion to remand his appeal back to the lower court in light of the Petitioner's "desire to resume his post-conviction proceedings and pursue all legal avenues to challenge his conviction and sentence."

In his motion to remand, the Petitioner acknowledged that, "pursuant to *Pike v. State*, 164 S.W.3d 257 (Tenn. 2005), a post-conviction petitioner has thirty days to reinstate his post-conviction petition after the court has allowed the petitioner to withdraw it" and conceded that his request to reinstate his petition for post-conviction relief was filed too late under this standard. Nonetheless, the Petitioner requested this court to waive the thirty-day *Pike* deadline in the interests of justice and judicial economy. The Petitioner asserted that strict adherence to the *Pike* deadline did not respect him as an individual, especially "where, as here, th[e] individual is brain-damaged and living in an inherently coercive environment which substantially impacts his ability to make voluntary decisions." The Petitioner also raised complaints about the post-conviction court's repeated denials of his requests to appoint a neuropsychologist. This court called for a response to the Petitioner's motion to remand from the State.

On August 20, 2009, the Petitioner filed a *pro se* petition for habeas corpus relief in federal court, seeking to have his conviction and sentence declared unconstitutional. Thereafter, the Petitioner filed a motion to supplement his motion to remand with the pleadings filed in federal court, asserting that the pleadings exemplified his desire to pursue all available legal remedies. This court granted the Petitioner's motion. Soon thereafter, by order dated November 24, 2009, this court ordered that "in the interests of judicial economy, the Petitioner's motion to remand shall be heard contemporaneously with argument on the merits of the Petitioner's Rule 3 appeal of the lower court's January 8, 2009, order finding Petitioner Hugueley competent and dismissing his petition for post-conviction relief."

On June 2, 2010, this court heard oral argument on both matters. Following careful review of the record, factual and legal issues, and the applicable law, we hereby deny the Petitioner's motion to remand and affirm the judgment of the post-conviction court in all respects.

## I.      Petitioner's Motion to Remand to the Post-Conviction Court

In his motion to remand, the Petitioner urges this court to hold that the thirty-day limitation period established by the Tennessee Supreme Court in *Pike* for a defendant to revoke a request to withdraw a post-conviction petition has been tolled in his case because he suffers from brain damage and mental illness and because his decision to withdraw his petition was made while in an "inherently coercive" environment." *See State v. Huddleston*, 924 S.W.2d 666, 670 (Tenn. 1996) ("Without question, incarceration for any period of time is inherently coercive. The custodial environment has been described as carrying a badge of intimidation though not physical which is equally destructive of human dignity.") (internal quotations omitted). In this regard, the Petitioner draws our attention to *Groseclose ex rel. Harries v. Dutton*, 594 F. Supp. 949, 956 (M. Dist. Tenn. 1984), which held that a combination of the Petitioner's pre-existing mental illness and the conditions of his

confinement rendered him incapable of making a knowing, voluntary, and competent decision to waive further appeals of his death sentence.

However, because the mental health and competency of virtually any petitioner seeking to revoke a request to withdraw his or her post-conviction petition will be at issue and because any such petitioner will invariably be incarcerated, the Petitioner's seemingly case-specific request for tolling is, in fact, tantamount to a request that this court replace the bright-line rule established by the Tennessee Supreme Court in *Pike* with a more flexible standard of our own devising. This we cannot and will not do.

In *Pike*, the Tennessee Supreme Court addressed the issue of whether a capital defendant could reinstate post-conviction proceedings after voluntarily withdrawing a petition for post-conviction relief. 164 S.W.3d at 262. The Petitioner in that case, Christa Gail Pike, stood convicted of first degree murder and had been sentenced to death for the killing of a fellow student at the Job Corps Center in Knoxville. Her conviction and sentence were affirmed on appeal, and the United States Supreme Court denied her petition for a writ of certiorari. *State v. Pike*, 978 S.W.2d 904 (Tenn. 1998), *cert. denied*, 526 U.S. 1147 (1999). On June 3, 1999, Pike timely filed a petition for post-conviction relief. During a hearing on June 25, 2001, Pike advised the trial court of her desire to withdraw her petition for post-conviction relief and to set an execution date. On September 4, 2001, Pike submitted a letter to the trial court reiterating her desire to withdraw her post-conviction petition and to schedule an execution date. At an October 2001 hearing, the trial court concluded that Pike had the right to withdraw her post-conviction petition as long as she was competent. *Pike*, 164 S.W.3d at 260. The trial court appointed Dr. William Kenner to conduct a psychiatric evaluation and later conducted an evidentiary hearing to determine Pike's competency. Following that hearing, "[t]he trial court found that Pike had freely and voluntarily decided to withdraw her petition and to waive post-conviction review. The trial court commented [that] Miss Pike has the right as a competent individual . . . to make a decision about her case, whatever [anyone else may] feel about that decision, and [granted] her . . . motion to withdraw her appeals." *Id.* (internal quotations omitted).

Twenty-nine days after the trial court granted Pike's request to withdraw her petition, she performed an about-face, attempted to revoke her withdrawal, and sought to have her post-conviction petition reinstated. The post-conviction court denied her request, and this court affirmed. Thereafter, the Tennessee Supreme Court granted permission to appeal and reversed.

The *Pike* Court held that post-conviction review of death sentences was not mandatory, *see id.* at 262, and that such review could not be carried out over the objection of a competent death-sentenced inmate, *see id.* at 264. The court then considered the circumstances under which a competent waiver of post-conviction review might be revoked.

The court observed that there was no then-existing procedure regarding such revocations. *Id.* at 265-66. However, the court recognized that it possessed the inherent power to fashion appropriate rules of procedure and elected to fashion such a rule to govern withdrawals of waivers of post-conviction review. *Id.* at 266. The court held that "a death-sentenced inmate whose request to waive post-conviction has been granted must be allowed thirty days from the trial court's order dismissing the petition to revoke the waiver." *Id.* at 266-67 (footnote omitted).

The *Pike* decision is silent with respect to whether, and under what circumstances, this thirty-day period may be tolled. However, if such tolling is permitted, it would certainly not be for circumstances so ubiquitous as to render the general rule meaningless. The facts the Petitioner urges on us in support of tolling – his "coercive" incarceration and mental health issues – would apply to virtually every petitioner who might seek to withdraw a waiver. If we were to hold they serve to justify a tolling of the *Pike* thirty-day period without more, we would essentially render the *Pike* rule a nullity and, instead, be forced to review each request to withdraw on a case-by-case basis to determine if we believed tolling was appropriate and, if so, for what time period. If the Tennessee Supreme Court had intended for lower courts to review these requests on a flexible case-by-case basis, it could simply have held so in *Pike*. Rather, the *Pike* Court adopted a bright-line thirty-day rule.

We believe the *Pike* Court made clear that the rule being established therein was "limited in scope." *Id.* at 267. When it granted relief to Ms. Pike, the court emphasized that she had not previously waived or attempted to waive post-conviction review, explaining that "[h]ad she done so, a very different case would have been presented." *Id.* The court further instructed that its "holding does not afford, and should not be applied to afford, death-sentenced inmates a means by which to manipulate and to delay the judicial process." *Id.* For this court to hold that the *Pike* rule has been tolled on the facts of this case would be to completely disregard these cautionary instructions. It would expose the rule to extreme misuse at the hands of death-sentenced inmates, who will always be able to mount an argument that their incarceration robbed them of their free will and that the post-conviction court erred in finding them competent notwithstanding their claims of suffering from mental ailments.

We note that the Petitioner threatened to proceed with his post-conviction appeals and throw a "monkey wrench" into the judicial process if he was not provided with daily telephone calls to his counsel. In his letter to the Attorney General's office dated July 6, 2009, the Petitioner specifically demanded that he be permitted to speak via telephone to his counsel one to two hours per day and to his friends and family for an unspecified amount of time on a daily basis. The Petitioner maintained that if the matter was not resolved "EXACTLY" as outlined in the letter by July 23, 2009, he would seek to "resume [his] appeals." The deadline passed without the Petitioner's demands being met. Shortly

thereafter, on August 10, 2009, the Petitioner signed an affidavit stating that he wished to resume his post-conviction proceedings.

Accordingly, by the Petitioner's own admission, his decision to resume post-conviction proceedings may be understood as a part of the Petitioner's continuing course of conduct of attempting to manipulate the system and protest the conditions of his incarceration. The Petitioner initially sought post-conviction relief so he could continue visitation with his then girlfriend. He spread feces on the wall of his jail cell to protest conditions at the jail. The Petitioner now seeks to protest the limitation placed by the prison on his telephone use by seeking to resume post-conviction proceedings. Such a manipulation of the system runs afoul of the Tennessee Supreme Court's ruling in *Pike* and presents the very situation that the *Pike* Court cautioned against.

The limited holding in *Pike* created a "single thirty-day period to unilaterally revoke an initial waiver of post-conviction review" by capital defendants. In the present case, the lower court entered an order on January 8, 2009, dismissing the petition for post-conviction relief. Under the rule in *Pike*, the Petitioner had until February 7, 2009, to file a revocation of the waiver. The Petitioner did not do so. This court defers to and is bound by the rulings of the Tennessee Supreme Court. We decline the invitation to expand the thirty-day period in which revocation of the initial waiver is permissible. Accordingly, the Petitioner's motion to remand the matter to the lower court to resume post-conviction proceedings is DENIED.

## II.     The Petitioner's Claim that the Post-Conviction Court Did Not Provide a Full and Fair Competency Hearing and Erred in Finding that He Was Competent to Withdraw His Post-Conviction Petition

Tennessee Supreme Court Rule 28, section 11 delineates procedures which trial courts must follow when a death-sentenced inmate seeks to withdraw a post-conviction petition and to waive post-conviction review. When a death-sentenced petitioner seeks to withdraw a post-conviction petition, the trial court must address the petitioner in open court and ascertain that the petitioner: (1) does not wish to proceed with the post-conviction proceedings; (2) "understands the significance and consequences of withdrawing the post-conviction petition"; (3) "is knowingly, intelligently, and voluntarily, without coercion, withdrawing the petition"; and (4) is competent to make the decision to withdraw the petition. Tenn. Sup. Ct. R. 28, §11(A).

The standard for determining a petitioner's competency to withdraw a post-conviction petition and waive further post-conviction proceedings is: "whether the petitioner possesses the present capacity to appreciate the petitioner's position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether the petitioner is suffering from a mental disease, disorder, or defect which may substantially

affect the petitioner's capacity." *Id.* at (B)(1). Competency to withdraw a post-conviction petition and waive post-conviction relief is presumed. *Id.* at (B)(2). However, if a genuine issue regarding the petitioner's present competency arises, the trial court shall enter an order appointing one or two mental health professionals from lists submitted by the State and the petitioner's counsel. *Id.* The appointed mental health professionals are to evaluate the petitioner to determine competency and file written evaluations within ten days of the appointment unless good cause is shown for later filing. *Id.*

If a genuine issue regarding the petitioner's present competency exists after the mental health professionals have filed their evaluations, the trial court shall hold an evidentiary hearing to determine the petitioner's competency. *Id.* at (B)(3). Following the hearing, the trial court shall enter an order granting or denying withdrawal of the petition, which shall include detailed findings of fact. *Id.*

The Petitioner raises numerous challenges to the process that he was afforded at his competency hearing, as well as its result. Specifically, the Petitioner claims that the post-conviction court erred by: (1) failing to provide appropriate expert assistance; (2) failing to provide sufficient time to prepare for the competency hearing; (3) denying the Petitioner equal protection of the law; (4) placing the burden on him to show incompetency by clear and convincing evidence; (5) considering the testimony and report of Dr. Seider, whose evaluations allegedly failed to meet the *Daubert/McDaniel* criteria and who, the Petitioner asserts, did not possess a valid license within the meaning of state law; (6) finding that the Petitioner was competent to effect a waiver; and (7) finding that the Petitioner's waiver was knowing, voluntary, and intelligent. After a careful review of the record, we reject each of these arguments and uphold the ruling of the post-conviction court.

### A.    The Petitioner's Claims that He Was Denied Access to Mental Health Experts

The Petitioner maintains that the post-conviction court violated his due process right to a full and fair hearing by denying him access to an "independent" and medically-appropriate mental health expert. The Petitioner takes issue with the post-conviction court's denial of his requests for neurological imaging, as well as funding for a psychiatrist, a neuropsychologist, and a pharmacologist. These experts were requested both for purposes of an evidentiary hearing on the petition for post-conviction relief and for purposes of determining the Petitioner's competency to withdraw the petition for post-conviction relief. After careful review, we hold that the post-conviction court did not violate the Petitioner's due process rights by denying funding for the requested experts and services.

The post-conviction court found that the Petitioner had no constitutional right to expert assistance in preparing for his competency hearing and that he was not entitled to

funding for his requested experts pursuant to Tennessee Supreme Court Rules. Under Rule 15, section 5(b)(1), counsel must make "every effort" to locate and retain experts within 150 miles of the court. The post-conviction court denied funding for a neuropsychologist, neuropsychiatrist, and pharmacologist because counsel failed to sufficiently set forth their efforts to locate experts within 150 miles of the court. With respect to the Petitioner's request for a pharmacologist, the court also determined that a psychiatrist or neuropsychologist should have sufficient expertise to address any issues that might arise regarding psychiatric drugs. The court denied the request for brain-imaging because current brain imaging technology would not have been available to the Petitioner's trial counsel. The court further found that any evidence that might be gleaned from the use of such imaging would not be relevant to an ineffective assistance of counsel claim. However, the court did not address the need for neurological imaging with regard to ascertaining the Petitioner's competency.

After the court found that a genuine issue as to the Petitioner's competency existed, the court requested counsel for both parties submit recommendations to the court for use as experts, as required by Tennessee Supreme Court Rule 28, section 11(B)(2). Although that rule permits the court to designate a single expert from among the recommendations, the post-conviction court initially chose two: Dr. John Hutson, a psychologist recommended by the State; and Dr. Peter Brown, a psychiatrist recommended by the Petitioner's counsel. Pursuant to Rule 28, section 11(B)(2), the court initially ordered the experts to produce a report in ten days. The post-conviction court later extended this deadline many times for "good cause shown," as section 11(B)(2) permits. The court ultimately rejected the report of the State's recommended expert, Dr. Hutson, because he was mistakenly compensated by the District Attorney General's Conference, thereby creating a potential appearance of impropriety. The court also later removed Dr. Brown, after he failed to begin his competency evaluation of the Petitioner for more than six months, notwithstanding numerous court orders to the contrary.

Thereafter, the court appointed Dr. Seidner, a psychologist suggested by the State, to complete the Petitioner's competency evaluation. To challenge Mr. Seidner's report, the Petitioner filed a motion requesting funding for the services of Dr. Pamela Auble, a neuropsychologist who had previously evaluated the Petitioner in 2003. While admitting that Dr. Auble was located slightly more than 150 miles from the court, the Petitioner maintained that Dr. Auble's services were necessary in light of the evaluation submitted by Dr. Seidner. Dr. Auble estimated it would take her four months to complete her competency evaluation. The court denied this request, finding that there was no entitlement to funding for an expert whose sole role was to assist a petitioner's counsel in evaluating or challenging the findings of a court-appointed expert.

The Petitioner contests the lower court's denial of expert assistance at all stages of the

competency proceeding, asserting that the denial violates clearly established law and his rights to due process. The Petitioner argues that the court unreasonably applied the law to the competency proceedings by denying him access to expert assistance and the opportunity to present contrary expert testimony at the competency hearing. He contends that "[a] hearing where only one opinion is presented is not adversarial or fundamentally fair."

The Petitioner's argument hinges on his assertion that he is constitutionally entitled to an expert to rebut the findings of the court-appointed expert. In support of this claim, he relies upon *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985), and *Panetti v. Quarterman*, 551 U.S. 930 (2007). Neither case establishes such a putative constitutional right that the Petitioner wishes to assert. *Ake* requires only that a criminal defendant have access to a "competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake*, 470 U.S. at 83. While *Ake* held that the failure to provide a mental health evaluation at the trial level violates due process, it did not establish a right to the examination conducted by an expert of the defendant's choosing. *See id.* Rather, the *Ake* Court clearly stated that an indigent defendant has no "constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Id.*

While *Panetti* establishes a defendant's right to be heard and present rebuttal evidence with respect to an court-appointed expert's competency determination, it likewise does not create a constitutional guarantee of funding for a rebuttal expert of the Petitioner's choosing. In *Panetti,* the court confronted the situation of an inmate who had made a motion seeking a competency hearing supported by letters and declarations from a psychologist and a law professor, both of whom opined that the inmate was not competent to be put to death. *Panetti*, 551 U.S. at 938. The trial court ordered that the inmate be examined by two mental health experts, as required by the applicable state statute. *Id.* at 939. These experts reported that they believed the petitioner was competent to be executed. *Id.* at 940. The trial court advised the petitioner's counsel that the competency determinations had been submitted and that counsel had ten days to make any additional motions. The petitioner's counsel did so, "criticiz[ing] the methodology and conclusions of the court-appointed experts," seeking funds for an independent expert, and requesting a competency hearing. *Id.* at 941. These objections notwithstanding, the court simply closed the case. *Id.*

Relying on *Ford v. Wainwright*, 477 U.S. 399 (1986), the *Panetti* Court held that it was constitutional error for the state court to "fail[ ] to provide petitioner with an adequate opportunity to submit expert evidence in response to the report filed by the court-appointed experts." *Id.* at 951. In particular, the *Panetti* Court read Justice Powell's concurrence in *Ford* as clearly establishing the principle that due process requires that prisoners who have made a substantial showing that they are not competent to be executed must be provided with a "constitutionally adequate opportunity to be heard." *Id.* at 952. This includes, "at a minimum, that a court allow a prisoner's counsel the opportunity to make an adequate

response to evidence solicited by the state court." *Id.*

The Petitioner's reliance upon these cases to establish a constitutional right to appointment and funding for the experts of his choosing is misplaced. Taken together, *Ake* and *Panetti* establish the minimum constitutional safeguards with respect to the provision of expert assistance in cases where the defendant is seeking constitutionally-entitled judicial review. It is well established that the Petitioner has no constitutional right to post-conviction review of his conviction at all. *See Pike*, 164 S.W.3d 262-64. Likewise, the Petitioner has no constitutional right to counsel or right to effective assistance of counsel during post-conviction proceedings. *House v. State*, 911 S.W.3d 705, 712 (Tenn. 1995). We decline the Petitioner's invitation to overlook the express absence of each of these rights to suddenly create an ancillary constitutional right at a competency hearing to the mental health experts and testing of his choosing.

Absent the creation of a new constitutional right, due process merely requires the post-conviction court to follow the procedures established by state rules. Our review of the record indicates that it did so. Rule 13, section 5, Rules of the Tennessee Supreme Court, allows for the funding of experts in capital post-conviction proceedings involving indigent defendants. Tenn. Sup. Ct. R. 13, § 5(a)(1). Before any such funding is granted, however, the court must determine whether there is a particularized need for the requested services and if the hourly rate charged for the services is reasonable in that it is comparable to rates charged for similar services. Tenn. Sup. Ct. R. 13, § 5(c)(1). Particularized need in the context of capital post-conviction proceedings is established when a petitioner shows, by reference to particular facts and circumstances of the petitioner's case, that the services are necessary to establish a ground for post-conviction relief and that the petitioner will be unable to establish that ground for post-conviction relief by other available evidence. Tenn. Sup. Ct. R. 13, § 5(c)(3).

The language of Rule 13, section 5(c)(1), (3) precludes funding of experts for counsel representing a capital defendant seeking to voluntarily forego post-conviction review. Rather, Rule 13, section 5(c)(3) only permits funding of experts in the capital post-conviction context when such expert services are necessary to *establish* a ground for relief. Under the procedure in Rule 28, section 11 for withdrawing a petition for post-conviction relief, the Petitioner was not entitled to the assistance of his own expert. The Petitioner's only right under Rule 28, section 11 was to submit a list of recommended experts to the court, which counsel for the Petitioner did. The post-conviction court was free to select and grant or deny funding for any particular expert sought by the defense. We can discern no manner in which the post-conviction court erred in this regard.

**B.      The Petitioner's Claim that the Post-Conviction Court Violated Due Process by Failing to Grant a Continuance to Provide Additional Time to**

**Prepare for the Competency Hearing and that, by Failing to Provide an Additional Continuance to Allow More Time for the Psychiatrist, He Recommended to the Court to Complete His Report**

The Petitioner raises two due process challenges to the post-conviction court's denial of post-conviction counsel's requests for continuances. First, the Petitioner claims that the trial court's failure to provide additional time for the Petitioner's recommended psychiatrist, Dr. Peter Brown, to complete his evaluation improperly deprived him of the services of a qualified expert. Second, the Petitioner argues that the post-conviction court denied the Petitioner sufficient time to prepare for his competency hearing, thus denying his due process right to the "opportunity to be heard 'at a meaningful time and in a meaningful manner'" as required by *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Neither argument has merit.

The decision to grant or deny a continuance generally rests in the sound discretion of the trial court. *State v. Hester*, 324 S.W.3d 1, 35 (2010). A "court's denial of a continuance will be reversed only if it appears that the . . . court abused its discretion to the prejudice of the defendant." *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004). A judge does not "abuse his discretion" by denying a continuance unless the denial deprived the defendant of a fair hearing. *See id.* Any petitioner seeking due process relief from the denial of a continuance bears the burden of establishing actual prejudice by showing that the result of the proceeding would have been different had the request for a continuance been granted. *See id.* The Petitioner has not shown that the post-conviction court's denial of either continuance deprived him of a fair hearing or demonstrated any actual prejudice with respect to either claim.

"A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Hester*, 324 S.W.3d at 35. The record reflects that the post-conviction court committed none of these errors. Rather, the court gave Dr. Brown more than sufficient time to complete an evaluation of the Petitioner's competency and that, in response to the court's generosity, Dr. Brown failed to diligently commence and complete his evaluation of the Petitioner. Indeed, at one point – already long past the reasonable deadline for completing the competency report – the defense team and Dr. Brown sought to delay the *beginning* of the evaluation so Dr. Brown could leave the country for several weeks. The post-conviction court was well within its discretion in denying the request.

The record reflects that the court provided the defense team with every reasonable opportunity to have a report prepared by the expert of their choosing. Pursuant to Tennessee Supreme Court Rule 28, section 11, the post-conviction court permitted both the State and

the Petitioner's counsel to submit lists of proposed experts. It then appointed a single expert from each list: Dr. John Hutson from the State's list and psychiatrist Dr. Peter Brown from the Petitioner's list. The post-conviction court's initial order, as directed by Rule 28, section 11 provided the experts ten days from January 23, 2008, to submit their evaluations as to the Petitioner's competency. At the time of appointment, the Petitioner's counsel immediately requested an extension of time for Dr. Brown to complete his evaluation. The court granted an extension until March 6, 2008. On February 14, 2008, counsel for the Petitioner advised the court that Dr. Brown was still unable to complete the evaluation. Dr. Brown, in fact, had yet to take any steps *to even begin* his evaluation. The court granted Dr. Brown another extension, this time until June 30, 2008, to complete the evaluation.

At the time it provided the extension until June 30, 2008, the court explicitly advised the parties that if Dr. Brown's evaluation was not completed by that date, the court would proceed without it. Nonetheless, on June 30, 2008, Dr. Brown had not only failed to complete the evaluation, he had failed to take any steps to begin his evaluation.

Part of Dr. Brown's purported reason for his delay was post-conviction team's insistence that Dr. Brown needed to perform additional medical testing and needed the assistance of a neuropsychologist. The post-conviction court denied these requests and made clear they should not serve as any excuse for additional delay. By order entered May 13, 2008, relating to its appointment of experts, the court noted that it had specifically rejected the contention of the Petitioner's counsel that Dr. Brown needed to perform additional medical testing on the Petitioner or needed the assistance of a neuropsychologist in order to fully assess the Petitioner's competency. **(T.R. Vol. 6, p. 766)**. The court made clear that Dr. Brown had available to him "prior neurological testing and the reports of two neuropsychologists, who previously evaluated the Petitioner, as well as an extremely extensive, previously prepared, social history of petitioner," and could rely on these extensive prior evaluations in making his assessment. The court also repeated its conclusion from its prior order that Dr. Brown could conduct a sufficient evaluation of the Petitioner using these tools, as well as the tools available within his field and area of expertise.

Regarding the Petitioner's final request for additional time for Dr. Brown to complete his evaluation, the post-conviction court stated the following:

The court finds incredulous Ms. Gleason's contention that she was confused as to whether Dr. Brown should begin his evaluation. This court's February 6, 2008, order clearly stated that "*Dr. Brown should use the tools available within his field and area of expertise to conduct his examination of petitioner.*" The court went on to state that Dr. Brown had *"been given thirty days in which to personally evaluate petitioner and conduct additional psychological testing."* The concluding paragraph of the court's order stated:

-31-

> *This court grants counsel's request for more time to conduct the mental health evaluation of the petitioner. Each of the appointed experts will have until March 6, 2008, to complete their evaluations and submit their reports to this court.*

> . . . [T]his court does not see how the order could have been any clearer. . . . [T]his court is not inclined to grant a lengthy delay to now begin an evaluation that should have begun over two months ago.

(Emphasis in original.)

On May 19, 2008, the lower court entered an amended order reflecting that counsel for the Petitioner had informed the court that Dr. Brown was unable to complete an evaluation of the Petitioner until late August 2008. In this regard, the court noted:

> concern over what appears to be a developing pattern of delay on the part of petitioner's counsel. Certainly, due to the complex nature of capital litigation, there will be inevitable delays; however, orchestrated delays will not be tolerated by this court. This court finds it important to note that the petitioner in this matter has continued from his initial appearance before this court to the present time to express his desire to have this matter resolved. He has been adamant in his desire to withdraw his post-conviction petition and forego further review of his claim; and, although he understands that certain procedures must be followed, he has on several occasions expressed frustration at the delay of these proceedings.

This order also plainly stated that should Dr. Brown be unable to complete his evaluation in comport with the order, the court would rely solely upon Dr. Hutson's evaluation, which was later discarded for other reasons.

During this time period, the Petitioner filed numerous *pro se* pleadings affirming his desire not to participate in the judicial process and not to proceed with his post-conviction appeals. These *pro se* pleadings, including those filed on May 18, June 24 and July 8, 2008, were extremely articulate and meticulously thought-out. For example, in these pleadings, the Petitioner pointed out that Rule 28, section 11 only required that the Petitioner be evaluated by one mental health expert. The Petitioner asserted that he had been found competent by Dr. John Hutson and stated that this finding should suffice. He pointed out that Dr. Hutson's finding was consistent with numerous previous evaluations by mental health experts finding him competent. In the same pleadings and letters, the Petitioner simultaneously and consistently requested that the court remove the Office of the Post-Conviction Defender from his case and permit him to proceed *pro se*.

Finally, on July 24, 2008, as the court entered an order removing the evaluation of the State's proposed expert, Dr. Hudson, from consideration due to issues arising from his payments, the court also removed Dr. Brown. The court explained:

> [This court] can not trust that Dr. Brown will be able to expeditiously perform an evaluation of petitioner and this court is not willing to delay this proceeding further in hopes that Dr. Brown may be able to, at some future date uncertain, accomplish what this court was under the impression it had already ordered him to do. Thus, this court is left with no alterative but to begin this process anew.

The court, therefore, ordered the State and post-conviction counsel to provide a new list of mental health professionals by July 29, 2008. The court further related that the mental health professional must be able to complete the evaluation by August 25, 2008. The court scheduled the competency hearing for August 28, 2008. In doing so, the court noted that the Petitioner "who has consistently expressed a desire to withdraw his post-conviction petition, will undoubtedly be frustrated by this court's ruling." The court ultimately appointed psychologist Dr. Seidner, who completed a report within three months of his appointment.

Dr. Brown was provided numerous extensions by the post-conviction court, yet failed time after time to commence his evaluation of the Petitioner. Dr. Hutson, who was appointed contemporaneously with Dr. Brown, completed his evaluation within three months of his appointment, on March 3, 2008. Likewise, Dr. Seidner completed his evaluation within three months of appointment. Dr. Brown, however, had not begun his evaluation of the Petitioner some six months after appointment. The post-conviction court was more than generous in its extension of time for completing evaluations of the Petitioner. Under these circumstances, we cannot conclude that the post-conviction court abused its discretion in failing to afford Dr. Brown additional time to *begin* a competency evaluation.

We also can find no fault with the post-conviction court's refusal of the request of the Petitioner's counsel for an extension of time to prepare for the competency hearing after receiving Dr. Seidner's report. Post-conviction counsel had a full eleven days to prepare to challenge Dr. Seidner's report. Moreover, post-conviction counsel was aware of and should have been preparing for the competency hearing for the better part of a year. During this entire time, post-conviction counsel had access to prior competency evaluations, medical reports, and the Petitioner's statements and written *pro se* motions. We do not believe that eleven days was insufficient to prepare for the cross-examination of Dr. Seidner.

Post-conviction counsel complains that Dr. Seidner's handwritten notes and audio tapes of his interview with the Petitioner came even later than the written report. Counsel states that the doctor's handwriting was "difficult to read," and the quality of the audio was

-33-

poor. These types of obstacles will often beset attorneys during complex litigation, and courts frequently expect attorneys to adapt, cope with, and ultimately surmount them. However, it was well within the post-conviction court's discretion to deny the continuance. As discussed above, the post-conviction court was confronted with what appeared to be an ongoing pattern of delay on the part of the Office of the Post-Conviction Defender. The court did not apply incorrect standards, reach an illogical conclusion, or make a clearly erroneous assessment of the evidence when it decided to finally put an end to such delay. Thus, the post-conviction court did not abuse its discretion by denying the Petitioner's requests for continuances. *See Hester*, 324 S.W.2d at 35.

Furthermore, the Petitioner has not and cannot show that the "denial of the continuance either deprived [him] of a fair [hearing], or caused an outcome that would not have occurred had the continuance been granted." *Id.* With respect to the motion for additional time to complete Dr. Brown's report, the Petitioner has made no showing that, had Dr. Brown completed his evaluation of the Petitioner, Dr. Brown would have concluded that the Petitioner was not competent to withdraw his post-conviction petition. Likewise, post-conviction counsel points to no new arguments or evidence that have been discovered since the competency hearing concerning Dr. Seidner, his methods, or his competency report, which counsel would have been able to discover and use to challenge the Petitioner's competency if only the post-conviction court had granted the request for additional time. Thus, post-conviction counsel cannot show that an extension of time would have benefitted the Petitioner or that it would have changed the entire outcome of the hearing. By virtue of failing to carry his burden of establishing actual prejudice resulting from the denial of either continuance, the Petitioner is not entitled to relief.

C.      **The Post-Conviction Court Did Not Deny The Petitioner Equal Protection of the Law**

The Petitioner claims that by denying his requests for additional mental health experts and by denying his additional requests for continuances, the post-conviction court treated him differently from other similarly situated individuals and, thereby, denied him equal protection of the law. The Petitioner cites to the Fourteenth Amendment to the United States Constitution and Article I, section 8, of the Tennessee Constitution, which requires that the State provides equal protection in the sense that "all persons similarly circumstanced shall be treated alike." *Doe v. Norris*, 751 S.W.2d 834, 841 (Tenn 1988) (internal quotation omitted). Where, as here, a protected class such as race or gender is not involved, "[t]o withstand equal protection review, [government action] that distinguishes between [different classes of individuals] must be rationally related to a legitimate governmental purpose." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446 (1985). "When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern." *Personnel Administrator of Mass. v. Feeney*, 442

U.S. 256, 272 (1979).

For purposes of this argument, the Petitioner compares his treatment to that of the class of Tennessee "capital petitioners who sought to dismiss pending post-conviction petitions." This "class" is apparently comprised of only two members – Ms. Pike and Mr. Reid. *See State v. Reid*, 197 S.W.3d 694, 701 (Tenn. 2006); *Pike*, 164 S.W.3d at 260. The Petitioner alleges there are significant differences between the time and resources he was given and the time and resources provided to the other "class" of similarly situated individuals comprised of Ms. Pike and Mr. Reid. For example, in preparation for his competency hearing, Mr. Reid was appointed a neuropsychiatrist and a psychiatrist, which was later assisted by a neuropsychiatrist at the psychiatrist's request, whereas the Petitioner was evaluated by a clinical psychologist after his selected court-appointed psychiatrist failed to complete a timely report. The Petitioner also claims that, in *Reid,* the court made an exception to the traditional requirements in Tennessee Supreme Court Rule 13 for obtaining experts and provided "six to seven months" for the expert to complete his report in *Pike*.

Important differences exist between the Petitioner's case and the cases of Mr. Reid and Ms. Pike. The issue in *Reid* was the determination of competency to proceed in a post-conviction action. *Reid*, 197 S.W.3d at 696. The initial hearings in *Pike* occurred prior to the Tennessee Supreme Court's November 21, 2002 order, which added section 11 to Tennessee Supreme Court Rule 28. *Pike*, 164 S.W.3d at 260 n.3. In both cases, the trial courts allowed six or more months for the court-appointed experts to complete their reports. However, in the present case, Dr. Brown failed to so much as begin his evaluation almost seven months after having been instructed to do so, in open defiance of numerous instructions and contrary language from the court. Due to the numerous delays by Dr. Brown and post-conviction counsel, the post-conviction court was forced to take some sort of action to advance the matter at the behest of the Petitioner, who requested numerous times that counsel be removed from representing him and complained about the delays. As a licensed psychologist, Dr. Seidner had all the necessary tools to evaluate the Petitioner's competency and, if he felt it was necessary, could have requested additional assistance from a different mental health specialist as the court-appointed expert in *Reid* did. After using his professional judgment and the many tools at his disposal, including prior evaluations of the Petitioner by neuropsychiatrists, he did not believe any additional experts were necessary in order for him to reach a conclusion. In short, the differing histories in each case would render any comparison of the Petitioner's treatment to that of Mr. Reid or Ms. Pike nothing more than apples to oranges.

Regardless, the Petitioner's equal protection claim must fail as a matter of law because the Petitioner's putative "class" is too small to use for any sort of meaningful equal protection analysis. The Petitioner has defined one class for purposes of his argument as Tennessee capital petitioners who sought to dismiss pending post-conviction petitions, a class

apparently comprised of only two members.  The other class includes only himself.  These "classes" are comprised of so few members as to defy even meaningful statistical analysis, much less equal protection analysis.

The Petitioner has cited no authority, and we can find none, where a court has applied equal protection analysis to provide additional legal protections to a defendant or criminal based on the treatment of two other defendants or criminals.  Furthermore, if the legal treatment of the initial defendants to undergo any particular sort of judicial process could be said to develop a "class" of similarly-situated individuals for equal protection purposes, then whatever treatment the courts selected for these initial cases would, as a necessary incident, establish constitutionally-required minimum safeguards for all such defendants.  Such an outcome would contravene numerous concerns of public policy, including the fact that it would provide judges with a strong incentive not to use rigorous processes or grant any leniency in such early cases out of a fear of constitutionally tying judges' hands in cases that might arise in the future.  We decline the Petitioner's invitation to start down such a perilous path.

### D.    The Post-Conviction Court Applied the Appropriate Burden of Proof at the Competency Hearing

The Petitioner asserts that the lower court applied an erroneous standard of proof at the competency hearing by requiring the Petitioner's counsel to prove the Petitioner's incompetency by clear and convincing evidence.  The Petitioner contends that this burden of proof violates due process guarantees under both the Tennessee and United States Constitutions.  Instead, the Petitioner asserts that neither party should bear the burden of proof and that the court's determination should be made using the "greater weight of evidence standard."  The issue of whether the post-conviction court "applied the correct burden of proof is a question of law that we review *de novo* with no presumption of correctness."  *Dellinger v. State*, 279 S.W.3d 282, 293 (Tenn. 2009).

The lower court recognized that Tennessee Supreme Court Rule 28, section 11 failed to provide guidance regarding the "type, quality, and quantity of proof necessary to establish [a] petitioner's incompetence or conversely his competence."  The lower court analyzed the holdings of *Pike* and *Reid* and the cases upon which they relied.  The lower court concluded that the post-conviction defender bore the burden of proving by clear and convincing evidence that the Petitioner was incompetent to withdraw his petition.  The lower court reasoned:

> [C]ompetency to withdraw a petition is closely related to competency to proceed.  Although the consequences of withdraw[al] are great, in that a withdraw[al] of post conviction may preclude any subsequent appellate review

-36-

of the claims contained in the petition, the ramifications of an adverse ruling as to competency to withdraw a properly filed post conviction petition are no greater than the consequences of an adverse competency determination for purposes of tolling the statute of limitations for filing a petition for post conviction relief. If it is determined that a late filing petitioner is competent, then he/she will be precluded from presenting his/her claims. The same is not necessarily true for a petitioner who seeks to withdraw his/her petition. In the context of competency to withdraw a petition, if a petitioner is found competent, he/she *may* waive presentation of their claims. However, pursuant to Rule 28, such a petitioner has thirty days to revoke such a waiver; and, thus, a petitioner has a remedy of sorts for an adverse determination as to competency not available to a petitioner who has failed to timely file his/her petition.

. . . [T]here is no constitutional right to post conviction review. Thus, this court finds the clear and convincing standard should apply to determining petitioner's competency to withdraw his post-conviction petition. It is against this backdrop that the court has evaluated the three prong analysis . . . adopted by Pike.

The Petitioner disputes the post-conviction court's application of the clear and convincing standard. He asserts that the clear and convincing standard violates his right to due process. The Petitioner contends that the competency determination should be made by the "greater weight of the evidence." He alleges that, once a court makes the initial determination that a genuine issue of competency has arisen, the initial presumption of competency dissolves and the simple weight of the evidence at the evidentiary hearing should guide the court's decision. The Petitioner maintains that the issue of competency should be treated as a non-adversarial issue in which the State, the petitioner, and the court all share an interest in protecting incompetents.

This court undertakes the determination of the appropriate burden of proof with great solemnity, recognizing the severity and irreversibility of a sentence of death. In *Rees v. Payton*, 384 U.S. 312 (1966), the United States Supreme Court addressed whether a death row inmate, alleged to be incompetent by counsel, should have been allowed to withdraw his petition for a writ of certiorari from the denial of habeas corpus relief. The Supreme Court directed the district court to determine whether the inmate had the "capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he [was] suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Rees*, 384 U.S. at 314. Tennessee Supreme Court Rule 28, section 11(B)(1) parallels the *Rees* test but "is limited . . . to the unique circumstances involved when a petitioner in a capital case seeks to withdraw

an already-filed post-conviction petition and waive further post-conviction relief." *Reid,* 197 S.W.3d at 701 n. 7; *see also State v. Kiser*, 284 S.W.3d 227, 244 n. 12 (Tenn. 2009).

Under the terms of Rule 28, section 11(B)(2), Rules of the Tennessee Supreme Court, a capital petitioner is presumed competent to withdraw a post-conviction petition and waive post-conviction relief. Thus, in order to conclude that a petitioner is not competent to make that choice, the lower court must be presented with evidence that overcomes the presumption of competency. While Rule 28, section 11 fails to delineate the burden of proof necessary to establish incompetency, Tennessee Code Annotated section 40-30-110(f) provides that at a post-conviction evidentiary hearing, "[t]he petitioner shall have the burden of proving the allegations of fact by clear and convincing evidence." *Reid*, 197 S.W.3d at 703. Indeed, in *Reid*, our supreme court adopted "the civil standard for mental incompetency adopted in *State v. Nix* . . . to competency determinations during post-conviction proceedings." *Id.*

In *Reid*, the defendant did not raise the issue of competency during the trial of his case. *Id.* at 697. However, in two other criminal murder trials, Reid did argue that he was not competent to stand trial. *Id.* His argument failed. *Id.* Reid's execution date was scheduled for April 29, 2003. *Id.* His counsel filed a motion asking the Tennessee Supreme Court to stay the execution to provide Reid a full year in which to decide whether to file a petition for post-conviction relief. *Id.* Counsel expressed concern as to Reid's competence to decide to forego post-conviction review. *Id.* The Tennessee Supreme Court denied the motion for a stay, acknowledging that Reid had been found competent to stand trial. *Id.* On April 28, 2003, hours before his execution, Reid filed a pro se petition for post-conviction relief. *Id.* The Office of the Post-Conviction Defender was appointed and later filed an amended petition and a motion asking the trial court to declare the Petitioner incompetent. *Id.* The lower court entered an order adopting the *Nix* standard for mental incompetence and declared that the Reid would bear the burden of proving incompetence by clear and convincing evidence. *Id.* at 697-98

The Tennessee Supreme Court addressed the issue of the standard for determining competency at the post-conviction level. In doing so, the court noted that a defendant has a constitutional right to be competent to stand trial. A defendant also has a constitutional right to competency to be executed. *Reid*, 197 S.W.3d at 699-700. The court recognized that the constitutional requirements of competency do not imply a coordinate right on collateral review. *Id.* at 700. The court noted that post-conviction procedures are not constitutionally required and that many of the rights applicable at trial are no longer attached. The court determined that there is no constitutional right to competent counsel in post-conviction proceedings. *Id.* at 700.

Notwithstanding this conclusion, our supreme court recognized that due process concerns may nonetheless be implicated in the post-conviction context. In *State v. Nix,* 40

S.W.3d 459 (Tenn. 2001), our supreme court announced a standard of mental incompetence that must be satisfied before due process requires the tolling of the statute of limitations. Noting that there was no constitutional right to collaterally attack a conviction, the *Nix* Court adopted the following standard: a petitioner is incompetent if "he is unable either to manage his personal affairs or to understand his legal rights and liabilities." *Nix,* 40 S.W.3d at 463.

The *Reid* Court noted that "[d]ue process requires only that a petitioner be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner. The civil standard of competence is sufficient to meet that requirement." *Reid,* 197 S.W.3d at 702. The court adopted a rule that placed the burden on the petitioner to make a threshold showing that he is incompetent to proceed in a post-conviction action. *Id.* at 703. The court then referred to the burden of proof pronounced in the Post-Conviction Act, *i.e.,* clear and convincing, rejecting Reid's argument that neither party should be held to a burden of proof in competency proceedings at the post-conviction level. *Id.* The court similarly rejected Reid's advancement of the preponderance of the evidence standard, holding that "[t]he preponderance standard applies to the issue of competency to stand trial and the issue of competency to be executed. As we explained above, however, these constitutional rights are distinguishable from competency to proceed in a post-conviction action. *Id.* at 704. (citations omitted).

The Petitioner argues that the clear and convincing standard is unconstitutional, violating his rights to due process. The Petitioner cites to *Cooper v. Oklahoma,* 517 U.S. 348, 369 (1996), in which the United States Supreme Court invalidated an Oklahoma statute that required defendants to prove their incompetency to stand trial by clear and convincing evidence. In reaching its holding, the Court observed that forty-six states and the federal government either required the prosecution to establish a defendant's competency or required defendants to establish incompetency by a preponderance of the evidence. *Cooper,* 517 U.S. at 360-62. The Court further emphasized that the "clear and convincing evidence standard affects a class of cases in which the defendant has already demonstrated that he is more likely than not incompetent." *Id.* at 364.

The Petitioner also relies upon *Howell v. State,* 151 S.W.3d 450 (Tenn. 2004), arguing that mental retardation is closely analogous to the question of competency. In *Howell*, the court addressed the burden of proof where a petitioner raised for the first time the issue of mental retardation to avoid capital punishment. *Howell,* 151 S.W.3d at 453. The *Howell* Court noted that the standard at trial is a preponderance of the evidence. *Id.* at 464. The court likewise noted that the right not to be executed is the same for defendants at both the trial level and the post-conviction level. *Id.* at 465. The court therefore held that, although at odds with the standard set forth in Tennessee Code Annotated section 40-30-117, the proof of mental retardation at the post-conviction level is likewise by a preponderance of the evidence. *Id.* To do otherwise would render the statute unconstitutional in its application.

*Id.* As noted by the *Reid* Court, the reasoning behind the standard announced in *Howell* is clearly distinguishable from the question presented regarding competency. *Reid*, 197 S.W.3d at 704. Again, the *Reid* Court focused upon the fact that there is no constitutional right to competency during post-conviction proceedings. *Id.* Moreover, the court noted the differences between the issue of competency to stand trial and the issue of competency to proceed in a post-conviction action. *Id.* at 704-05. The *Reid* Court rejected the due process argument and imposed the statutorily-imposed clear and convincing standard. *Id.* at 705.

The State asserts that "if the clear and convincing standard is adequate to ensure due process in the context of both tolling and competency to proceed in post-conviction, it is proper for purposes of voluntarily withdrawing a timely filed post-conviction petition." We agree. "Due process considerations do not mandate different levels of competency at different stages of post-conviction proceedings." *Id.* at 702. If a petitioner must establish by clear and convincing evidence his incompetence to commence a post-conviction action, there can be no constitutional bar to requiring the petitioner to establish by clear and convincing evidence that he is incompetent to bring the matter to conclusion.

### E.     The Post-Conviction Court Did Not Err by Considering Dr. Seidner's Report and Testimony

Next, the Petitioner maintains that the lower court erred in considering Dr. Seidner's report and testimony since his evaluation methods failed to meet the *Daubert/McDaniel* criteria. The Petitioner further asserts that when he issued his report and testified, Dr. Seidner did not possess a valid license in full force and virtue to practice psychology, as required by Tennessee Code Annotated section 63-11-201(b). Accordingly, he asserts that consideration of Dr. Seidner's testimony and report was improper.

At the competency hearing, the Petitioner's counsel introduced an affidavit establishing that Dr. Seidner's medical license expired on September 30, 2008. Dr. Seidner conceded that he had not apparently sent a check for his licensing fee. The Petitioner's counsel then moved the court to strike Dr. Seidner's report provided to the court on October 31, 2008, and to strike his entire testimony. An affidavit submitted on December 1, 2008, by Melody Spitzas, the records custodian relating to licensure for psychologists in Tennessee, reflected that Dr. Seidner's license expired on September 30, 2008. Dr. Seidner renewed his license online on November 15, 2008. The affidavit further reflected that "there is a board policy that gave Dr. Seidner a ninety (90) day grace period after his license expired during which he could renew without penalty." The lower court found that Dr. Seidner's license was not suspended but was in a grace period of payment of his license fee.

Tennessee Code Annotated section 63-11-218 provides in part,

(a) Each licensed psychologist, or psychological examiner, or senior psychological examiner or certified psychological assistant shall pay an annual registration fee as set annually by the board, payable in advance, for the ensuing year. As a condition of renewal, the board may require that the licensee or certified person establish that the licensee or certified person has satisfied any continuing education requirements established by board rule.

(b)(1) When any licensee or certified person shall fail to pay the annual fee after the renewal fee becomes due and satisfy such continuing education requirements for renewal as may be established by the board, as provided in this section, the license or certificate of such person shall be automatically revoked by the board without further notice or hearing, *unless renewal is completed and all fees paid prior to the expiration of sixty (60) days from the date such renewal fees become due.*

(Emphasis added). Dr. Seidner's renewal was due on September 30, 2008. He paid his past due license fee on November 15, 2008. Dr. Seidner was within the sixty-day grace period. Accordingly, per the language of the statute, Dr. Seidner's license was not revoked. Dr. Seidner properly testified at the competency hearing. Moreover, Dr. Seidner's evaluation was conducted on August 27 and 28, 2008, well over a month before Dr. Seidner's license was scheduled to expire. The post-conviction court did not err in concluding that Dr. Seidner's license was valid at both the time of the evaluation and at the competency hearing. The Petitioner is not entitled to relief on this issue.

The Petitioner also complains that the testimony of Dr. Seidner was inadmissible at the competency hearing because it did not meet the requirements of *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997), and *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Petitioner contends that Dr. Seidner's testimony fails to comply with the requirements of *McDaniel* because: (1) Dr. Seidner did not consult with Dr. Caruso and Dr. Auble before rendering an opinion; (2) Dr. Seidner did not request neuropsychological testing or imaging; (3) Dr. Seidner did not secure appropriate conditions for his evaluation; and (4) Dr. Seidner did not administer tests in accordance with the prescribed methodology. The State asserts that the Petitioner's challenges go not to the admissibility of Dr. Seidner's testimony but, rather, to the weight to be given to his testimony.

Rules 702 and 703 of the Tennessee Rules of Evidence address the admissibility of opinion testimony of expert witnesses. A court may admit expert testimony only if the proponent demonstrates that: (1) the expert is qualified; (2) the evidence is relevant to the

suit; and (3) the evidence is reliable. *McDaniel*, 955 S.W.2d at 264. Questions regarding the admissibility, qualifications, relevancy, and competency of expert testimony are left to the discretion of the trial court. *Id.* A trial court's ruling on the admissibility of such evidence may be overturned on appeal only if the discretion is exercised arbitrarily or abused. *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002).

The Petitioner contends that the post-conviction court should have excluded the testimony of Dr. Seidner because Dr. Seidner failed to secure appropriate conditions for his evaluation and failed to administer tests in accordance with the prescribed methodology. Specifically, the Petitioner complains that Dr. Seidner conducted a non-contact interview without seeking a contact visit with comfortable conditions. The Petitioner contends that Dr. Seidner was unable to complete all of the subtests since he chose to conduct the evaluation in a non-contact visitation room. He further maintains that Dr. Seidner, because of the non-contact setting, completed the Petitioner's responses on self-administered tests. He, therefore, concludes that Dr. Seidner's opinions lack sufficient indicia of scientific reliability to be trustworthy within the meaning of Tennessee Rule of Evidence 703. Thus, he asserts that Dr. Seidner's testimony did not and could not substantially assist the court in making a competency determination within the meaning of Tennessee Rule of Evidence 702. The Petitioner urges this court to apply the non-exclusive factors identified by our supreme court for preliminary determination of the reliability and trustworthiness of scientific evidence, as set forth in *McDaniel.*

In *McDaniel*, the court held:

A Tennessee trial court may consider in determining reliability: (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*McDaniel*, 955 S.W.2d at 265. The *McDaniel* Court characterized these factors as useful in applying Tennessee Rules of Evidence 702 and 703. The supreme court has also said, however, that "[the *McDaniel* ] factors are not mandated in every case in which expert evidence is offered and should not be applied unless the factor or factors provide a reasonable measure of the expert's methodology." *Brown v. Crown Equip.,* 181 S.W.3d 268, 272 (Tenn. 2005). Likewise, the supreme court has said that "[t]he rigid application of the *McDaniel* factors to all expert testimony is problematic because all expert testimony may not 'fit' within the factors." *Id.* at 277.

As asserted by the State, the assessments employed by Dr. Seidner enjoy longstanding

acceptance and use in the psychological community, both nationally and internationally. *See Coe v. State*, 17 S.W.3d 193, 227 (Tenn. 2000) (holding that the MCMI3, SIRS, MMPI and MMPI-2 have long been recognized as scientifically valid and reliable, thus meeting requirements outlined in *McDaniel* and *Van Tran*)(citing *State v. Blanton*, 975 S.W.2d 269, 278 (Tenn. 1998); *State v. Payne*, 791 S.W.2d 10, 17 (Tenn. 1990)). Dr. Seidner was qualified to administer the tests and to form an opinion as to the results of those tests. Additionally, Dr. Seidner's method of administering the tests, while not conforming to the preferred method of evaluation, was due, in part, to the Petitioner's refusal to participate in a contact evaluation. On cross-examination, the Petitioner's counsel had the opportunity to question Dr. Seidner regarding the reliability of personality assessments administered in a non-contact setting. Any consideration to the reliability of the testing in a non-contact setting went to the weight of Dr. Seidner's testimony and not the admissibility. Further, while the Petitioner complains that Dr. Seidner failed to consult with other mental health experts, the Petitioner ignores the fact that Dr. Seidner reviewed and relied upon the reports of Dr. Auble and Dr. Caruso. We cannot conclude that the lower court abused its discretion in admitting the testimony of Dr. Seidner.

F. **The Petitioner Was Competent to Withdraw his Petition for Post-Conviction Relief**

The Petitioner asserts that the lower court erred in finding him to be competent under the Rule 28, section 11 standard. The standard for determining competency of a petition to withdraw a petition for post-conviction relief under Rule 28, section 11 is:

> Whether the petitioner possesses the present capacity to appreciate the petitioner's position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether the petitioner is suffering from a mental disease, disorder, or defect which may substantially affect the petitioner's capacity.

The post-conviction court's finding of competency will be presumed correct unless the evidence preponderates against the finding. Tenn. R. Sup. Ct. R. 28, §11(C).

Under the applicable standard, a petitioner is competent if he is not suffering from a mental disease or defect. *Rumbaugh v. Procunier*, 753 F.2d 395, 398 (5th Cir. 1985). Conversely, if the petitioner does suffer from some mental disease, the court must then determine if that disease or defect prevents him from understanding his legal position and the options available to him or whether the mental defect would prevent him from making a rational choice among his options. *Id.* If the petitioner cannot understand his legal position or otherwise make a rational choice among his options, then he is incompetent. *Id.*

The Petitioner asserts that the post-conviction court erred by not finding that he suffered from a mental disease or defect. The Petitioner claims that the evidence established that he is brain-damaged, suffers from distorted reality perception, is impulsive, and has a history of psychosis and severe mental illness. The Petitioner additionally asserts that the evidence further established he had a pattern of engaging in self-harm and irrational thoughts. Moreover, he contends that his ability to make rational choices has been severely curtailed as a response to his environment in prison. The Petitioner cites the following incidents as examples of his inconsistency and inability to make rational choices:

- In April 2002, the Petitioner said he would not accept any other sentence than death but went to trial instead of pleading guilty in 2003.
- The Petitioner attempted to abandon his direct appeal in 2003, but then wrote the judge asking that he appoint current counsel Kelly Gleason to represent him.
- In 2005 and 2006, the Petitioner made public comments about not filing a petition for post-conviction relief but filed one in 2006.
- On August 10, 2009, the Petitioner signed an affidavit asking to pursue all legal avenues to challenge his conviction and sentence.

The Petitioner further contends that the conditions of his confinement were "sensory deprivation" and "psychological torture." Finally, the Petitioner contends that while he is suicidal, the rule in *Pike* was never intended to "empower individual death-sentenced inmates to invoke the power of the state to assist suicide."

The Petitioner's claims run directly contrary to the existing evidence, expert testimony, and expert analysis. The post-conviction court carefully reviewed the testimony and report of Dr. Seidner. The lower court also reviewed and relied upon prior reports from Dr. Auble and Dr. Caruso. None of these experts diagnosed the Petitioner with a mental disease or defect that could impair his ability to understand his position or to make a rational choice with respect to abandoning or continuing his appeals. Both Dr. Caruso and Dr. Seidner concluded that the Petitioner is willing to accept his death sentence, not because he is suicidal but because he "has weighed his self interest in terms of challenging this and what he would get, which is continued decline and life on death row, which he has rejected."

The Petitioner has failed to show any serious flaw or defect in the methods used to determine his competency. Dr. Seidner's report indicated that he employed the following methods in his evaluation of the Petitioner:

- Review of documents as listed and supplied by court order dated August 1, 2008;
- Clinical interview on August 27, 2008, totaling 4.5 hours;

- Personality Assessment Inventory (PAI) on August 27, 2008;
- Clinical interview on August 28, 2008, totaling 5.5 hours;
- Validity Indicator Profile (VIP) on August 28, 2008;
- Wisconsin Card Sorting Test: Computer version 4 (WCST) on August 28, 2008; and
- Weschler Adult Intelligent Test III (WAIS-III) on August 28, 2008.

Dr. Seidner used these methods to carefully and extensively develop an overall portrait of the Petitioner's mental health history and current mental competency. Dr. Seidner's report reflected that the Petitioner came from an egregiously conflicted and disturbed family system where the Petitioner was placed in the middle of overwhelming loyalty conflict and a campaign to malign and alienate the relationship with his biological father. The Petitioner's father committed suicide when the Petitioner was twelve years old. The Petitioner spent most of his youth in the correctional system. The Petitioner viewed his mother as preoccupied with her own life. The Petitioner viewed his time in juvenile facilities as preparation for a lifetime in adult correctional facilities. The Petitioner's family failed to provide consistency, and the Petitioner maintained strong resentment toward his mother. The Petitioner was an action-oriented and stimulation-seeking child who was aggressive and destructive. These behaviors intensified into his adolescence and adulthood. The Petitioner's documented history of conduct disorder, underage drinking, and illicit drug use includes multiple incidents of seriously assaulting peers starting at age seven, fire setting, property damage, lying, and manipulation. Dr. Seidner noted that these behaviors reflect poor impulse control.

Dr. Seidner also reported that the Petitioner's medical history included a head injury. The Petitioner denied that this injury interfered with his daily living, mood, or consciousness. The Petitioner had a cyst removed from his brain shortly after his incarceration for the murder of his mother. Dr. Seidner reflected that the removal of the cyst appears to have left some effect on the speed and dexterity of his left hand. The Petitioner denied any substantive effects. The Petitioner self-reported two heart attacks but denied any impairment as a result. The Petitioner self-reported aches and pain and expressed concern about present and future health and physical viability in prison. The Petitioner believed he will receive negligent medical care in prison and cast doubt about his future quality of life. "Continued living in jail is, in his view, adverse to his self interests."

Dr. Seidner noted that there were occasional expressions of concern regarding whether the Petitioner suffered from a psychiatric disorder but that the Petitioner has never demonstrated stable, overt symptoms of such a disorder. The doctor noted that the Petitioner, when enraged or when using mood altering substances, is "so wantonly out of control and dangerous that a number of psychiatric conditions [could be] considered as a predicate of his behavior." However, Dr. Seidner noted that "[t]he record . . . returns again and again to the

-45-

consistent fact pattern of a conduct disorder, under-socialized, aggressive type." In other words, Dr. Seidner concluded that the records do not reflect the consistent presence of a major psychiatric disease that might account for his history of behavioral dysfunction.

To the contrary, Dr. Seidner found the Petitioner to be an individual capable of thinking flexibly and effectively. He characterized the Petitioner as opinionated but explained that his opinions were developed through reading, experience, and thought. Dr. Seidner found no indication of a mood disorder, depression, excessive guilt, or internalizing. The Petitioner described himself as bored and unhappy, but this characterization was in the context of the limitations of his activity and relationships due to his high security needs. Dr. Seidner could not detect any delusions, thought blocking, hallucinations, or thinking disorder. The Petitioner denied feeling suicidal. The Petitioner viewed prison life as a natural consequence of his actions for which he alone is responsible.

Dr. Seidner reported the following test results:

- **Validity Indicator Profile**. This test is a measure of consistency of effort and an objective basis to judge the test-taking orientation and validity of the Petitioner's cognitive performance. Dr. Seidner opined that the Petitioner began the testing with less effort than he ended. The test was performed pursuant to the Petitioner's wishes in a non-contact setting. On the non-verbal subtest, Dr. Seidner did not see any intentional suppression of ability. He determined that the VIP suggests that the Petitioner's testing on the Wisconsin Card Sort and the Weschler are valid and reliable.

- **Weschler Intelligence Scale III**. Dr. Seidner concluded that, while there may be some practice effect from the 2003 administration of the test, the Petitioner demonstrated a very high level of intellect, rational process, and cognitive competence. The Petitioner had a verbal IQ of 127 and a verbal comprehension index score of 136. Dr. Seidner commented that because this was a non-contact visit, he was unable to derive a performance IQ. Otherwise, no deficits were revealed by the test.

- **Wisconsin Card Sorting Test.** This test was administered on a laptop computer. The test is sensitive to brain damage and detects subtle deficits that other measures frequently fail to identify. The Petitioner completed all six of the sorting categories in eighty trials while producing only eight errors, which is substantially better than normatively anticipated. The results of the WCST demonstrate integrity

-46-

in higher level problem solving, hypothesis generation and testing, flexibility, and responsivity to feedback.

- **Personality Assessment Inventory (PAI).** The Petitioner has spent twenty years in a maximum security setting. Thus, Dr. Seidner noted that a traditional profile would be inappropriate. Dr. Seidner related that elevated scores relating to depression, non-support, and propensity toward suicide must be interpreted in the context of his present long term incarceration.

Dr. Seidner found that the Petitioner's development from conduct disorder to antisocial personality disorder was a result of the choices the Petitioner has made. The Petitioner did not demonstrate symptoms of an Axis I disorder with psychotic features or an Axis I psychotic disorder such as schizophrenia. The Petitioner did not present symptoms of an organic disorder. His history of self-destructiveness is a function of his antisocial personality disorder and expressed through rage storms or volatility. Dr. Seidner opined that the Petitioner is manipulative if he does not get what he wants. The doctor found that a prior overdose was a result of his lack of impulse control, with little care for the consequences, and a deep attraction to increasing the intensity of his experiences of excitement. The doctor noted that when the Petitioner has punished or killed, the Petitioner asserted that it has been with full intention and was a rational decision.

The Petitioner described himself as a "criminal with morals" and asserted that he has pursued has own self-interest throughout his life. His decision to waive his post-conviction appeals is consistent with what he believes is his best interest. The Petitioner is offended that anyone would question his rationality, intelligence, or mental status. Dr. Seidner noted that the Petitioner demonstrates a practical and technical understanding of the legal process. The Petitioner rejected his counsel's "anti-death penalty" position. He stated that, if he was not on death row, his counsel's support and advocacy would not be there. The Petitioner expressed no remorse and felt no remorse for his killings. The Petitioner asserted that he believed in God and in the Bible and viewed his execution as a natural consequence for his behavior.

Dr. Seidner offered the following opinion in his written report:

**Prong 1: Is the person suffering from a mental disease or defect?**

Mr. Hugueley is diagnosed with an antisocial personality disorder and his behavior is consistent with this disorder. It is not, however, a predicate of any deficit in his rational process. It does not impair his appreciation of his circumstances or options available to him. It does not challenge his autonomy

or in anyway reduce the voluntary nature of his choices.

**Prong 2: If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?**

Mr. Hugueley has no mental disease or defect that prevents him from understanding his legal position and options. His mental status and performance on objective measures of intelligence, executive decision making capacity, and personality testing demonstrate his rationality and high level of flexible cognition that is not distorted by affect. He fully appreciates his position and makes rational choices with respect to abandoning further litigation.

**Prong 3: If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?**

There is no observable or measurable impairment in Mr. Hugueley's rational process as it relates to his functioning in this litigation. He has the demonstrated capacity to make rational, pertinent, and reasoned decisions. He fully understands and anticipates the consequences of these decisions from both a personal and legal perspective.

The records in the present case and in the Petitioner's direct appeal indicate that the Petitioner has a firm grasp of the legal process and the legal ramifications of his decisions. The record further demonstrates the Petitioner's willingness to use his knowledge of the legal system to manipulate proceedings to further his own interests or agenda. The Petitioner is currently serving a death sentence and two life sentences under severe prison restrictions because of his violent history. The post-conviction court's determination of competency is supported by the fact that the Petitioner arrived at the competency hearing with a presumption that he was competent. This presumption was bolstered by previous determinations of competency. The record reflects that the post-conviction court had no doubt as to the Petitioner's competency but merely ordered the evaluation out of an abundance of caution with consideration of the severity of the proceedings. With consideration of the evidence and the applicable standard of review, we conclude that sufficient basis exists to support the lower court's finding that the Petitioner is competent to withdraw his petition for post-conviction relief.

### G.     The Petitioner's Waiver was Knowing, Voluntary, and Intelligent

The Petitioner asserts that his decision to withdraw his petition for post-conviction relief was not knowing, intelligent, and voluntary. First, he asserts that he was not sufficiently advised of his rights in the colloquy required by Rule 28, section 11(A), Rules of the Tennessee Supreme Court. Second, the Petitioner contends that the court failed to conduct the requisite inquiry into the Petitioner's understanding of the rights that he would be abandoning and the consequences of withdrawal. Third, the Petitioner maintains that the alleged waiver was a by-product of onerous conditions of confinement. The State responds that Tennessee Supreme Court Rule 28, section 11 does not provide for appellate review of this issue. Rather, the State contends that review is limited to the sole question of whether the Petitioner was competent to withdraw his petition for post-conviction relief.

The plain language of Rule 28, section 11(C), Rules of the Tennessee Supreme Court, limits appellate consideration to the issue of competency. Competency is delineated as one of the four factors which must be found before permitting a capital defendant to withdraw a post-conviction petition. Tenn. Sup. Ct. R. 28, §11(A)(1)-(4). The test for determining competency is "whether the petitioner possesses the present capacity to appreciate the petitioner's position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether the petitioner is suffering from a mental disease, disorder, or defect which may substantially affect the petitioner's capacity." Tenn. Sup. Ct. R. 28, §11(B)(1). In addition to competency, the lower court must also determine that the petitioner: (1) does not desire to proceed with any post-conviction proceedings; (2) understands the significance and consequences of withdrawing the post-conviction petition; and (3) is knowingly, intelligently, and voluntarily, without coercion, withdrawing the petition. Tenn. Sup. Ct. R. 28, § 11(A)(1)-(3). While it appears to this court that although the plain language of Rule 28, section 11(C) appears to specifically limit appellate review to the issue of competency, we would be constrained to adopt such a circumscribed interpretation with consideration of the nature of the right being relinquished, even though that right is not constitutionally mandated.

This court has previously acknowledged that Rule 28, section 11 requires a determination that a withdrawal of a capital post-conviction petition is knowingly, voluntarily, and intelligently made and that the petitioner is competent to make such a decision under the *Rees* standard. *Christa Gail Pike v. State*, No. E2002-00766-CCA-R3-PD, 2004 WL 1580503, *18 (Tenn. Crim. App., at Knoxville, July 15, 2004), *rev'd on different grounds by*, 164 S.W.3d 257 (Tenn. 2005). Thus, this court recognized two distinct criteria: (1) the competency of the petitioner and (2) that the withdrawal of the petition is knowing, voluntary and intelligent. While the right to seek post-conviction relief is statutorily created and not constitutionally mandated, we cannot conclude that a legitimate reason exists to distinguish the waiver of a statutorily created right from the waiver of a constitutionally mandated right when given the severity of the punishment of death. Our position is bolstered by the fact that Rule 28, section 11, Rules of the Tennessee Supreme Court, explicitly

requires that the withdrawal of post-conviction review must be made knowingly, voluntarily, and intelligently.

While Rule 28, section 11 does not expressly provide for appellate review of the determination of whether the withdrawal of the petition is knowingly, voluntarily, and intelligently made, we determine that such review is implicit with consideration of the nature of the ultimate sentence. Indeed, when a sentence of death is imposed, the court has dual interests. One, the court has the responsibility to see that the presumptively legal sentence is carried out. Two, the court has a responsibility to ensure that society's ultimate penalty is not imposed except in appropriate cases and that the sentence is not arbitrary or the result of mistake. *See generally Gregg v. Georgia*, 428 U.S. 153 (1976). The second prong does not end upon the relinquishment of further review of the sentence. Thus, when a death row inmate expresses the desire to waive collateral proceedings, the courts of this state have an implicit obligation to assure that the waiver of collateral review is knowing, intelligent, and voluntary.

In the present case, the lower court questioned the Petitioner about his expressed intent to withdraw his petition for post-conviction relief. The Petitioner maintained that he wished to withdraw his petition for post-conviction relief and that he understood the ramifications of his withdrawal. The Petitioner indicated to the court, both orally and in writing, his desire to withdraw his petition and indicated that he only signed the initial petition in order to resolve some visitation issues. The Petitioner stated that he was not coerced or forced into seeking to withdraw his petition; that he was not promised anything to withdraw his petition; and that he was not under the influence of any medication that would alter his thinking. The Petitioner complains that the post-conviction court erred by not entering findings of fact and conclusions of law regarding the knowing and voluntary nature of the withdrawal.

Rule 28, section 11(A), Rules of the Tennessee Supreme Court, requires the trial court to enter an order "stating the court's findings regarding items (1) through (4)." Following the hearing on January 10, 2007, the post-conviction court entered an order on January 16, 2007, finding that the Petitioner's decision to withdraw his post-conviction relief petition was knowing, intelligent, and voluntary. In the order, the court found that the Petitioner spoke to his counsel regarding his desire to withdraw his petition and was aware that a withdrawal would preclude future petitions for post-conviction relief and would result in the setting of a new execution date. The court found that the Petitioner indicated that he was not under the influence of any medication or substance that could possibly interfere with his ability to make a clear decision. The court also found a genuine issue as to competency and ordered the State and the Petitioner's counsel to submit a list of mental health professionals.

In its January 8, 2009 order dismissing the Petitioner's post-conviction petition, the

court reiterated its previous findings. The post-conviction court, however, did not make specific findings in the January 2009 order that the Petitioner's decision continued to be knowing, voluntary, and intelligent. Regardless, the post-conviction court made findings of fact in the January 2009 order directly relating to whether the Petitioner's decision to dismiss his petition continued to be knowing, voluntary, and intelligent.

In the January 2009 order, the post-conviction court found that the Petitioner "has a broad grasp of the legal ramifications of his decisions." Dr. Siedner indicated in his report that the Petitioner "demonstrates a practical and technical understanding of the legal process." The court found that through both his written correspondence and verbal interaction, the Petitioner "has demonstrated a detailed understanding of the sentence he faces, the ramifications of withdrawing his current petition for post-conviction relief, and the legal procedures association with such a decision." The lower court further found:

> In addition to the breadth of understanding exhibited by the above excerpts from petitioner's written correspondence with the court, each time petitioner appeared before this court, the court found petitioner to be both coherent and impassioned in his requests and/or statements. It seems clear from petitioner's statements that he not only understands the ramifications of the choice he is making; but, clearly understands the legal process involved in exercising such a choice. Moreover, petitioner appears particularly adept at manipulating the system to suit his purpose. Thus, his choices appear both cogent and rational. Although the petitioner's choices may be, as Dr. Caruso labeled them, 'unconventional,' such choices are the result of rational thought.

The court also found that "in its interactions with petitioner, petitioner appears to be able to rationalize between the legal options available to him and has made a cogent choice to forego further review of his post-conviction relief claims." The record supports these findings of the post-conviction court. Accordingly, the Petitioner's decision to dismiss the post-conviction relief petition was knowingly, voluntarily, and intelligently made.

## CONCLUSION

Based upon a review of the record, we affirm the judgment of the post-conviction court dismissing the Petitioner's post-conviction relief petition.

_____
JOHN EVERETT WILLIAMS, JUDGE